801 A.2d 221

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
CAROLE LONG, DEFENDANT–RESPONDENT.

Argued February 25, 2002—Decided July 15, 2002.

*Richard E. Incremona*, Assistant Prosecutor, argued the cause for appellant (*John A. Kaye*, Monmouth County Prosecutor, attor-

ney; *Mary R. Juliano,* Assistant Prosecutor, of counsel and on the brief).

*Kelly S. Anderson,* Assistant Deputy Public Defender, argued the cause for respondent (*Peter A. Garcia,* Acting Public Defender, attorney).

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Peter C. Harvey,* Acting Attorney General, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

The critical issue in this appeal is whether extra-judicial declarations made by an accused prior to the commission of a murder are hearsay, and if so, whether they are admissible under any exception to the hearsay rule to prove defendant's motive for killing the victim where the declarations imply that defendant was involved in another death that the medical examiner has not classified as a homicide and for which defendant has not been charged. In an unpublished opinion, the Appellate Division analyzed the probative value and prejudicial effect of the evidence and concluded that it was not admissible because "its use carried a risk of prejudice and confusion that outweigh[ed] its uncertain probative value." We reverse.

I.

This is a homicide case in which the trial is still pending. Our statement of facts has been gathered from testimony presented to a Monmouth County Grand Jury and facts revealed at a probable cause hearing. That Grand Jury has indicted defendant Carole Long for the murder of her friend, Teresa Roche, also known as Tracey. In August 1998, defendant lived with her ninety-one year old mother, Mabel Long, in a garage apartment in Avon, New Jersey. Like defendant, Tracey Roche shared her home with her own mother, Irene Roche, in Hillsborough. Tracey and defendant had been friends since 1992. Although they had not visited each

other in the period before Tracey was murdered, they spoke at length on the telephone and e-mailed each other regularly.

Defendant and Tracey arranged to meet for lunch on Thursday, August 27, at Ruby Tuesday's restaurant in the Monmouth Mall. At that time, defendant was planning to attend her daughter's September 11, 1998 wedding in San Diego, California. Tracey had been invited to attend the wedding but she declined.

According to Irene Roche, defendant called Tracey on August 27 to cancel their lunch date. Irene overheard Tracey exclaim, "Oh my God." Irene went to the door of Tracey's bedroom and heard Tracey ask, "Was she hurt?" Irene remained in the doorway of Tracey's bedroom until Tracey hung up the telephone. Tracey then told Irene that defendant had cancelled their lunch plans because defendant's mother, Mabel Long, had fallen down the stairs.

Tracey telephoned defendant the following day, Friday, August 28, to inquire about Mabel. Again, Irene overheard Tracey's side of the conversation as Tracey exclaimed, "Oh I'm so sorry," and then asked "Is there anything I can do?" Irene waited in the open doorway of Tracey's bedroom until the telephone conversation ended. After Tracey hung up the telephone she told Irene that defendant's mother had died. Tracey said that defendant was not planning a funeral and that a memorial service would be held on December 10, the anniversary of the day defendant's mother and father had met. Tracey added that it was a good thing that the luncheon had been cancelled, because otherwise she would have been with defendant when Mabel Long died.

On Saturday, August 29, Tracey again called defendant and the two women made plans to have lunch the following day at the Brielle Yacht Club. Tracey planned to stay overnight and return on Monday, August 31, and asked Irene to telephone her at defendant's home on Monday to give her an excuse to leave.

On Sunday, August 30, at 8:28 a.m. the Avon police responded to a 911 call from defendant's residence requesting an ambulance

for an elderly woman who had fallen down the stairs. When they responded to the call, police found defendant's mother alive but injured. Mabel Long was transported to the hospital and died later that day. Defendant also was taken to the hospital because of a panic attack. Irene Roche recounted that later the same morning Tracey called defendant to advise that she was running late, and would not be there for lunch at 2:00 p.m. as originally planned. At about 12:45 p.m. that Sunday, Tracey left her home in Hillsborough driving her red Mazda without saying anything to reveal whether defendant had informed her about that morning's events. When Tracey did not follow her usual practice of calling her mother upon arriving at her destination, Irene Roche telephoned defendant at about 3:30 p.m. to see if Tracey had arrived. There was no answer. Irene left a message on the answering machine, but did not receive a return call.

The following day, Monday, August 31, Patrolman Greg Torchia of the Avon Police Department received a call from an investigator in the county medical examiner's office questioning how Mabel Long could have sustained a four-inch gash on her head when the stairs on which she had fallen were carpeted. In order to make arrangements for the investigator to speak to defendant and to examine the area where the fall allegedly occurred, Patrolman Torchia drove to defendant's residence to schedule an appointment. No one answered his knock on the door. However, Torchia noticed a red Mazda parked on the concrete apron of defendant's driveway. When he looked inside the car, he saw what he described as a "lumpy mass" covered by a garment bag. Torchia wrote down the license number and called headquarters for a "look-up" on the car. He was informed that the car was registered to Tracey Roche of Hillsborough, New Jersey. Torchia left a note in defendant's mailbox asking her to call the Avon police to schedule an interview.

At about 1:00 p.m. that Monday, Irene Roche telephoned Tracey at defendant's residence as previously arranged to provide Tracey with the desired excuse to leave. When no one answered the

phone, Irene left a message. Again, no return call was received. That evening at about 8:00 p.m. Irene called again. This time defendant answered the telephone and told Irene that Tracey was not there. She added that perhaps Tracey had met some friends and gone to Long Beach. Defendant told Irene not to bother her anymore and abruptly ended the call.

With still no word from Tracey, Irene called defendant again on Tuesday, September 1, at about 9:30 a.m. Defendant was abrupt and said that she was calling the mortician and promised to call Irene back. After hearing nothing from defendant for one and one-half hours, Irene again called defendant. Sounding more agitated than ever defendant complained of high blood pressure and panic attacks, and expressed concern about attending her daughter's impending wedding in California. She reiterated that she did not know where Tracey was and again suggested that she may have met with friends and gone to Long Beach Island.

That same Tuesday, the investigator for the county medical examiner called the Avon police to inquire whether an appointment had been made to inspect defendant's apartment. Because defendant had not responded to his note, Patrolman Torchia visited defendant's residence. When defendant was told that the medical examiner wanted to inspect the residence, defendant said it was not a good time and that the officer should return the next day. Patrolman Torchia observed that the red Mazda was gone and asked defendant about it. She explained that the car belonged to a friend from North Jersey who was visiting to help with the arrangements pertaining to her mother's death.

Meanwhile, Irene Roche had reported to the Hillsborough Police Department that her daughter was missing. She was told that not enough time had passed to consider the matter a missing persons case, but an officer called the Avon police and then told Irene that Tracey's car had been reported in defendant's driveway two days earlier.

On Wednesday, September 2, Patrolman Torchia returned to defendant's residence for the third time, accompanied by the

investigator from the county medical examiner's office. Patrolman Torchia stayed outside while the investigator examined the premises and, while he waited, he noticed what appeared to be a large bloodstain in the driveway where the Mazda had been parked. The stain was wet and it appeared to Torchia as though someone had tried to clean it. At that time, the cause of Mabel Long's death was described as "accidental." The cause of death, however, was later changed to "undetermined." Defendant has never been charged with any crime or offense relating to her mother's death.

On September 4, 1998, defendant flew to California to attend her daughter's wedding. Five days later, on September 9, the Neptune Township Police received a report of a red Mazda parked on Central Avenue in Ocean Grove that was emitting a foul odor. A Neptune police officer used a tool to open the door and saw a "lumpy mass" of clothing and a garment bag inside. Under the clothing was the badly decomposed body of a woman later identified as Tracey Roche. The body was unclothed except for some jewelry and was wrapped in plastic bags. Interviews of individuals in the area indicated that the Mazda had been there as early as September 4. The death of Tracey Roche was determined to be a homicide. Among the several contributing factors to her death were "multiple sharp force and blunt force injuries involving mainly the head."

On September 10, 1998, the day after Tracey Roche's body was discovered, Captain Phillip George of the Monmouth County Prosecutor's Office telephoned defendant in San Diego. Defendant told him that she had last seen Tracey on either Thursday, August 26, or Friday, August 27, when they had lunch in Avon at a restaurant called The Columns. She said that Tracey went home after lunch and that she received several calls from Tracey over the next two days complaining about her mother, Irene. Defendant added that on Sunday, August 30, Tracey called to invite her to meet at The Columns, but defendant declined because her mother had just died. Defendant stated that she saw Tracey's car

parked in her driveway later that day and found a note in her door from Tracey saying that she was in the area. Defendant claimed that she left her door open that night but never saw or spoke with Tracey before leaving for California on September 4.

Also on September 10, 1998, New Jersey State Police forensic personnel tested the stain in defendant's driveway that Patrolman Torchia had observed. The results were positive for blood. A search warrant for defendant's residence was executed the next day. Although the apartment initially appeared clean and neat, the officers executing the warrant soon suspected that furniture had been rearranged. Careful examination revealed that pieces of carpeting under furniture had been removed and towels, newspapers and blankets were placed over bloodstained floorboards. DNA tests of the blood revealed that it came from Tracey Roche.

On Sunday, September 13, 1998, investigators interviewed defendant in California. They observed cuts on both of her hands. She reiterated that she had last seen Tracey when they had lunch at The Columns. Defendant indicated that she knew Tracey would be in Ocean Grove on Sunday, August 30, but she had told Tracey that they could not get together because of Mabel's death. Defendant repeated that she never saw Tracey again, although she saw Tracey's car parked at her home later that day and found a note from Tracey in her door. She claimed that Tracey was meeting a different friend in Avon.

During the interview, defendant explained that the blood in her apartment and cuts on her hands came from a violent encounter with an intruder in her home who attacked her when she returned from a walk on Sunday, August 30. Defendant stated that she ran out of the apartment, hid in the bushes and then went to the beach where she spent the night. When she returned the next morning, she found her apartment a mess and blood on the carpet from the cuts on her hands. Defendant explained that she cleaned up the blood because she did not want the landlord to be angry with her.

On January 10, 2000, defendant was indicted for the murder of Tracey Roche, in violation of *N.J.S.A.* 2C:11–3, and for two counts

of possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4d. The State filed a motion *in limine*, seeking to use at trial statements made by the victim, Tracey Roche, to her mother, Irene Roche, pursuant to *New Jersey Rule of Evidence* 803(c)(3). The State sought to use those statements to establish defendant's motive for killing Tracey Roche. The State's theory was that defendant killed Tracey Roche to eliminate the chance that she would implicate defendant in the death of defendant's mother, Mabel Long, or raise the suspicion that defendant was involved in Mabel Long's death.

At the hearing conducted on that motion, the State argued that although the proffered statements by Irene were hearsay, they should be admitted into evidence under the state of mind exception to the hearsay rule, *N.J.R.E.* 803(c)(3). Defendant argued that the statements should be excluded pursuant to *N.J.R.E.* 404(b) as improper evidence of other crimes or wrongs that tended to show disposition to commit the charged offense.

The court granted the State's motion in part, ruling that the following items could be admitted into evidence: (1) the victim's intention to go to defendant's house on August 30, 1998, stay overnight at defendant's house, and return to her own home on August 31, 1998; and (2) the victim's plan with her mother, Irene, to telephone defendant's house on August 31, 1998, if it was getting late and Tracey had not yet returned home. The court held that those statements showed the victim's intention to meet with defendant, and thus were admissible under the state of mind exception to the hearsay rule, *N.J.R.E.* 803(c)(3).

However, the court held inadmissible: (1) Tracey's statement to Irene that defendant's mother, Mabel, fell down the steps on August 27, 1998 and (2) Tracey's statement to Irene that defendant's mother, Mabel, died on August 28, 1998. The court found that those statements were other-crime evidence under *N.J.R.E.* 404(b). The court found that although the first and second prongs of *State v. Cofield*, 127 *N.J.* 328, 605 *A.*2d 230 (1992), had been satisfied in that proof of a motive for killing Tracey was a material

issue and that the death of Tracey Roche was similar in kind and reasonably close in time to the death of Mabel Long, the other *Cofield* prongs could not be met. The court held that there was no clear and convincing evidence, as required by the third prong of *Cofield*, that defendant was involved in the death of Mabel Long because the medical examiner had not ruled the death to be a homicide. Under the fourth prong of the Cofield test, which requires the probative value of the evidence to be outweighed by any apparent prejudice, the court held that

> the prejudice is really overwhelming if it comes out in front of the jury that [defendant] is suspected of and is being implicated in the death of her mother Mabel Long; and the reason she killed Tracey Roche was to cover up the possibility that she killed her mother Mabel Long. It is going to be next to impossible, it is going to be impossible really for any curative instruction to deal with that. So that prejudice is really overwhelming.
>
> . . . .
>
> Accordingly, I'm not going to allow any reference to the motive evidence that [defendant] killed Tracey Roche to cover up the murder of Mabel Long.

The Appellate Division denied the State's motion for leave to appeal the court's order. This Court granted the State's motion for leave to appeal and summarily remanded the matter to the Appellate Division to hear the appeal on the merits. 167 *N.J.* 83, 769 *A.*2d 1047 (2001).

On remand, the Appellate Division affirmed the Law Division's order in an unpublished opinion. The court found that the lower court did not abuse its discretion in ruling "that the inflammatory nature of Irene's proposed testimony and its use carried a risk of prejudice and confusion that outweighs its uncertain probative value." The Appellate Division relied on the fact that "[d]efendant has not been charged with murdering her mother, and the medical examiner has not determined the death to be a homicide." It reasoned that "[t]he proposed testimony raises issues of prejudice and potential jury confusion to a degree that a proper limiting instruction is hard to fathom."

The State again sought leave to appeal to this Court. We granted the State's application, 170 *N.J.* 202, 785 *A.*2d 432 (2001), and now reverse.

## II.

### A.

The State, through the Monmouth County Prosecutor, argues that Tracey Roche's declarations to Irene Roche about how and when Mabel Long died are intertwined inextricably with Tracey Roche's murder and support a strong motive for defendant to murder Tracey. It argues that the Appellate Division failed to consider whether Tracey Roche's declarations fell within an exception to the hearsay rule, and engaged solely in a Rule 403 analysis of whether the evidence was more prejudicial than probative. The State maintains that defendant's statements to Tracey Roche are not hearsay because their evidentiary value does not hinge on the truth of the statements, and that Tracey's statements to Irene fall within the state of mind exception to the hearsay rule, N.J.R.E. 803(c)(3), because they provide a motive for Tracey's murder—that she could inculpate defendant in the fall and death of Mabel Long.

Finally, the State contends that under a *Rule* 403 analysis, the probative value of the evidence outweighs its prejudicial effect. To support that conclusion, the State asserts that there is no less prejudicial evidence by which it can prove defendant's motive to kill Tracey Roche and that any prejudice to defendant can be ameliorated by an appropriate limiting jury instruction.

Defendant argues that the courts below correctly excluded the motive evidence because its low probative value will have an overwhelmingly prejudicial effect on the jury. Defendant also contends that the inference that defendant killed Mabel Long is other-crime evidence and the State is unable to meet the four-pronged test for admissibility of such evidence under *Cofield*.

The Attorney General, as *amicus curiae*, agrees with the Monmouth County Prosecutor that defendant's statements to Tracey Roche on August 27 and 28 regarding her mother's fall and subsequent death are not hearsay because they are not being offered for the truth of the matter asserted. In addition, the

Attorney General argues that if defendant's statements are considered hearsay, they are admissible as res gestae evidence under the state of mind exception to the hearsay rule, *N.J.R.E.* 803(c)(3), because they indicate defendant's motive for the murder of Tracey Roche, or they are admissible under the present sense impression exception, *N.J.R.E.* 803(c)(1), or the excited utterance exception, *N.J.R.E.* 803(c)(2), to the hearsay rule. Finally, the Attorney General argues that an analysis of the evidence as other-crime evidence under Rule 404(b) is not necessary because it is admissible as res gestae evidence and not as other-crime evidence.

## B.

Preliminarily, it is important to make clear the specific evidence, rejected by the trial court, that the State seeks to have admitted during the trial. That evidence can be described as two statements made by defendant to Tracey, who then told Irene Roche what defendant had said to her. The first statement concerns the conversation defendant had with Tracey on Thursday, August 27, when defendant told Tracey that defendant's mother had fallen down the steps that day (August 27 statement). The second statement relates to a conversation defendant had with Tracey on Friday, August 28, when defendant informed Tracey that defendant's mother had died that day (August 28 statement). Collectively, those two statements comprise the motive evidence at issue in this case. The State seeks to introduce those two statements as evidence through Irene's testimony that Tracey told her what defendant said about Mabel's fall and death.

The determination whether the motive evidence is admissible requires a multi-level analysis. First, we must decide whether either one or both of the motive evidence statements made by defendant to Tracey on August 27 and 28 were hearsay, and if so, whether they are admissible under any exception to the hearsay rule. Second, if those statements are found to be admissible, regardless of whether or not they are hearsay, the Court also

must decide whether those statements should be excluded under a *Rule* 404(b) and/or a *Rule* 403 analysis.

We turn now to whether defendant's statements to Tracey Roche during their telephone conversations that Mabel Long had fallen down the stairs on August 27 and had died on August 28 constitute hearsay when presented through Irene's testimony. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *N.J.R.E.* 801(c). Under that definition, the hearsay rule applies when a declaration is offered to prove the truth of the statement attributed to the declarant. *State v. Marshall,* 123 *N.J.* 1, 132, 586 *A.*2d 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993); *State v. Johnson,* 216 *N.J.Super.* 588, 600, 524 *A.*2d 826 (App.Div. 1987). It follows, therefore, that if evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial. *State v. Chavies,* 345 *N.J.Super.* 254, 274, 785 *A.*2d 1 (App.Div.2001). But if proffered evidence is hearsay, it can be admitted only pursuant to one of the exceptions to the hearsay rule. *N.J.R.E.* 802.

Whether either or both of the statements are hearsay depend on the State's intended use of them and who will present that testimony at the trial. We agree with the State that, when the two statements are presented at the trial by Irene to show that defendant predicted the precise manner and cause of Mabel's death days before it happened, the statements are not hearsay because they are not offered for the truth of the matter—that Mabel actually fell on August 27 and died on August 28. *Spragg v. Shore Care,* 293 *N.J.Super.* 33, 56–57, 679 *A.*2d 685 (App.Div. 1996). It is undisputed that Mabel did not die until August 30. On the other hand, the State concedes that when Irene testifies at the trial concerning what Tracey told her, the State must prove that Tracey accurately reported to Irene what defendant told her and that the State must rely on hearsay to do so. Because the

State must rely on hearsay to prove that defendant actually made the two reputed statements to Tracey, we conclude that the two statements must be treated as hearsay as between defendant and Tracey and as between Tracey and Irene. That said, we must decide whether any exception to the hearsay rule applies to the statements as required by *N.J.R.E.* 802.

 The two statements do not fit neatly into any one exception to the hearsay rule. Nonetheless, we conclude that the statements are part of the *res gestae* of Tracey's murder, *N.J.R.E.* 803(c)(3), and that the standard enunciated regarding the admission of evidence pursuant to the excited utterance exception, *N.J.R.E.* 803(c)(2), helps to corroborate the trustworthiness of the two statements.

The ancient *res gestae* concept, now codified in *N.J.R.E.* 803(c)(3) and referred to as the state of mind exception, covers "statement[s] made in good faith of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, *motive,* design, mental feeling, pain, or bodily health).…" *N.J.R.E.* 803(c)(3) (emphasis added). Despite the urging of some to abandon the use of the principle denominated as *res gestae, see* 2 *McCormick on Evidence* § 268 (Strong ed., 5th ed.1999); 2 *Wigmore on Evidence* § 218 (Tillers Rev.1983), "[c]ourts continue to cling to it." *State v. L.P.,* 338 *N.J.Super.* 227, 241, 768 *A.*2d 795 (App.Div.) (Wefing, J.A.D., concurring), *certif. denied,* 170 *N.J.* 205, 785 *A.*2d 434 (2001).

The res gestae concept has been used to admit a wide variety of evidence in both the criminal and civil context under circumstances that are now codified as hearsay exceptions in the *New Jersey Rules of Evidence. See, e.g., Hansen v. Eagle–Picher Lead Co.,* 8 *N.J.* 133, 146, 84 *A.*2d 281 (1951) (holding that declarations by agent were admissible as res gestae evidence "only if they are so concomitant with the main fact under consideration and so connected with it as to illustrate its character"); *Trenton Passenger Ry. Co., Consol. v. Cooper,* 60 *N.J.L.* 219, 221–22, 37 *A.* 730 (E. & A.1897) (holding that "ejaculatory words" were admissible as

res gestae evidence because they were "part of what occurred"); *Hunter v. State,* 40 *N.J.L.* 495, 536–38 (E. & A.1878) (holding that letter and declarations showed decedent's present intent to meet defendant in Philadelphia and were admissible under res gestae exception); *Luse v. Jones,* 39 *N.J.L.* 707, 711 (N.J.Err. & App. 1877) (holding that writings and declarations describing sale of furniture were admissible as part of res gestae because they were recorded contemporaneously with sale); *Donnelly v. State,* 26 *N.J.L.* 601, 612 (N.J.Err. & App.1857) (holding that victim's declaration shortly before he died about "[t]he *cause* of the injury, stated in such immediate connection with the *manner* of his receiving it, and so shortly after it was *received,* ... may be admissible in evidence, as part of the res gestae"). While the res gestae exception has been characterized "as a shorthand reference to the principles contained in [at least] two exceptions to the rule excluding hearsay evidence pertaining to spontaneous and contemporaneous statements, and pertaining to statements of physical or mental condition of declarant and related history," *State v. Schumann,* 111 *N.J.* 470, 479, 545 *A.2d* 168 (1988) (citations omitted), the exception historically applied to more than just excited utterances under *Rule* 803(c)(2) or present sense impressions under *Rule* 803(c)(1).

Despite its hearsay character, res gestae evidence is considered reliable because the surrounding circumstances guarantee its trustworthiness. That is,

the admissibility of the proofs as res gestae has as its justifying principle that truth, like the Master's robe, is of one piece, without seam, woven from the top throughout, that each fact has its inseparable attributes and its kindred facts materially affecting its character, and that the reproduction of a scene with its multiple incidents, each created naturally and without artificiality and not too distant in point of time, will by very quality and texture tend to disclose the truth.

[*Robertson v. Hackensack Trust Co.,* 1 *N.J.* 304, 312, 63 *A.2d* 515 (1949).]

Thus, "[i]t may be regarded as long since settled in this State that a person's own statements of a present existing state of mind, when made in a natural manner and under circumstances dispelling suspicion and involving no suggestion of sinister or improper motives, reflect his mental state and are competent to

prove the condition of his mind—that is, his plan or design." *State v. Thornton,* 38 *N.J.* 380, 390, 185 *A.*2d 9 (1962). "The rule ... is that where the declaration is concomitant with the main fact under consideration and is so connected with it as to illustrate its character, it may be proved as part of the res gestae; but, where it is merely narrative of a past occurrence, it cannot be received as proof of the character of that occurrence." *Blackman v. W. Jersey & Seashore R.R. Co.,* 68 *N.J.L.* 1, 2, 52 *A.* 370 (Sup.Ct. 1902). In some cases, courts focused narrowly on whether the declaration was spontaneous, exclamatory and contemporaneous, and refused to admit declarations that were not uttered coincidentally with the happening of an event. *E.g., State v. Simmons,* 52 *N.J.* 538, 542, 247 *A.*2d 313 (1968) (holding that rape victim's identification of attacker was admissible as either res gestae or spontaneous declaration because victim "was still in a state of excitement"), *cert. denied,* 395 *U.S.* 924, 89 *S.Ct.* 1779, 23 *L.Ed.*2d 241 (1969); *State v. De Paola,* 5 *N.J.* 1, 15, 73 *A.*2d 564 (1950) (stating that "[t]o be admissible as part of the res gestae the statement must have been made spontaneously under conditions such as to preclude calm reflection and eliminate any opportunity for composing a self-serving declaration"). However, this Court noted in *Cestero v. Ferrara,* 57 *N.J.* 497, 502, 273 *A.*2d 761 (1971), that

> in more recent times the res gestae concept has been considerably broadened and the requirement for strict contemporaneity has been modified. Now evidence of declarations made under the immediate influence of the principal transaction or occurrence is admissible. They need not be concomitant or coincident with the exciting stimulus; they may be subsequent providing that in the light of all the circumstances it may be said reasonably that the exciting influence had not lost its sway or had not been dissipated in the interval.
>
> [ (Citation omitted).]

Under this modern trend, our courts have admitted evidence as part of the res gestae because of the connection between the evidence and the crime for which a defendant is charged even where there is an interval of time between the occurrence and the declaration to which it relates and even in factual situations that pose a risk of prejudice to the defendant. In the capital case of

*State v. Martini,* 131 *N.J.* 176, 239–40, 619 *A.*2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995), we held that the defendant's threats against the victim's spouse and the theft of the victim's car were "part and parcel" of a kidnapping rather than other-crime evidence. The defendant's actions "serve[d] to paint a complete picture of the relevant criminal transaction" and therefore were admissible. Id. at 242, 619 *A.*2d 1208. Further, a limiting instruction was unnecessary because the evidence was admitted under the res gestae exception. Ibid.

Similarly, in *State v. Cherry,* 289 *N.J.Super.* 503, 522, 674 *A.*2d 589 (N.J.Super.App.Div.1995), evidence that the defendant and two other men planned to rob a bar shortly before a police officer was murdered outside the bar was admitted as part of the res gestae of the murder. The court held that "[e]vidence of events that take place during the same time frame as the crime charged in the indictment will not be excluded if the evidence establishes the context of the criminal event, explains the nature of, or presents the full picture of the crime to the jury." *Ibid. Accord State v. L.P., supra,* 338 *N.J.Super.* at 236, 768 *A.*2d 795 (stating that evidence is admissible as res gestae of criminal event if it involves "an identifiable, overriding objective that ties together disparate conduct"); *State v. Torres,* 313 *N.J.Super.* 129, 160–61, 713 *A.*2d 1 (App.Div.) (holding that testimony that defendant sold jewelry in exchange for cash and cocaine and tried to bribe corrections officers with cash and jewelry was res gestae evidence necessary to establish full nature of robbery of jewelry store, not other-crime evidence), *certif. denied,* 156 *N.J.* 425, 719 *A.*2d 1023 (1998); *see also State v. Ehlers,* 98 *N.J.L.* 236, 246, 119 *A.* 15 (E. & A.1922) (holding that defendant's statement that he killed his wife and son was admissible as part of *res gestae* because it was made immediately after and was connected to act); *State v. Overton,* 85 *N.J.L.* 287, 291, 88 *A.* 689 (N.J.Err. & App.1913) (holding that evidence that defendant did not want to marry wife and did so only after he was arrested on bastardy charge was part of *res gestae* and relevant to defendant's motive to kill her).

■ The *res gestae* or state of mind exception can be used to prove or explain acts or conduct of a defendant-declarant. Such statements of a defendant-declarant are admissible "because they are so connected with an act, itself admissible as part of the *res gestae*, as to have become incorporated with it." *Hunter v. State, supra,* 40 *N.J.L.* at 537. Here, Tracey had no sinister reason to fabricate the statements and she reported them to her mother almost contemporaneously as she heard them over the telephone. Those circumstances enhance the trustworthiness of the statements. In addition, it was natural for Tracey to tell Irene that defendant had just said that Mabel had fallen down the stairs and died because Tracey and defendant had been friends for a long time. Moreover, the time between when the statements were made by defendant to Tracey and the time of Tracey's death was less than seventy-two hours.

To summarize, a review of our case law reveals a sound justification to admit into evidence the extra-judicial declarations made by defendant.

> Declarations ... by the accused prior to the criminal event ... are admitted notwithstanding their "hearsay" character .... [because] the behavior of ... the defendant [is] part of the mosaic of the criminal event, and hence, insofar as [the defendant's] declarations bear upon either the quality of [the defendant's] acts or a relevant state of mind, [the declarations] must be accepted as part and parcel of the critical scene.
>
> [*State v. Baldwin,* 47 *N.J.* 379, 394, 221 *A.*2d 199, *cert. denied,* 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L.Ed.*2d 442 (1966).]

Such declarations are deemed to be an integral part of the criminal scene because they bear on the quality of the defendant's act or his or her intent or motive. *Ibid.*

Contrary to the trial court's conclusion that the two statements are other-crime evidence, a conclusion that was not addressed by the Appellate Division, we hold that the statements are part of the *res gestae* of Tracey's murder; they satisfy the state of mind exception and are not other-crime evidence. As such, the statements are admissible under *N.J.R.E.* 803(c)(3). Proof of defendant's motive to kill Tracey establishes the context of the criminal event and assists in presenting the full picture of the crime to the

jury. *State v. Martini, supra,* 131 *N.J.* at 242, 619 *A.*2d 1208. Those statements are "woven into the fabric of the ... crime, and [are] inseparable from" Tracey's subsequent death. *State v. Mule,* 114 *N.J.L.* 384, 392, 177 *A.* 125 (E. & A.1935). The declarations were made by defendant prior to the murder of Tracey and should be admitted as *res gestae* evidence because they are part of the "mosaic" of the criminal event. *State v. Baldwin, supra,* 47 *N.J.* at 394, 221 *A.*2d 199.

## C.

The Attorney General also argues that the statements are admissible under the excited utterance exception to the hearsay rule, *N.J.R.E.* 803(c)(2). Under that Rule, an excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." *Ibid.* The Rule is "based upon the premise that the excitement caused by the observation of a startling event insures the reliability of a spontaneous statement about it made at or near the time of the event's occurrence." Biunno, *Current* N.J. *Rules of Evidence,* comment 1 on N.J.R.E. 803(c)(2), at 905 (2002). The Rule requires that (1) there was a startling event, (2) the statement was made while the declarant was under the stress of excitement from that event, and (3) the statement related to that event. 6 *Wigmore on Evidence* § 1750, at 203–04, 222 (Chadbourn rev.1976). The rationale for the excited utterance exception lies in the notion that "excitement suspends the declarant's powers of reflection and fabrication," consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable. 2 *McCormick on Evidence* § 272, at 204–05 (5th ed.1999); *see also United States v. Joy,* 192 *F.*3d 761, 766 (7th Cir.1999), *cert. denied,* 530 *U.S.* 1250, 120 *S.Ct.* 2704, 147 *L.Ed.*2d 974 (2000); *State v. Williams,* 106 *N.J.Super.* 170, 172, 254 *A.*2d 538 (App.Div.), *certif. denied,* 55 *N.J.* 78, 259 *A.*2d 228 (1969), *cert. denied,* 397 *U.S.* 1057,

90 *S.Ct.* 1405, 25 *L.Ed.*2d 675 (1970); *accord State v. Lazarchick,* 314 *N.J.Super.* 500, 522, 715 *A.*2d 365 (App.Div.), *certif. denied,* 157 *N.J.* 546, 724 *A.*2d 804 (1998).

 In deciding whether there was an opportunity to fabricate or deliberate, a court should consider "the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance." *State v. Williams,* supra, 106 *N.J.Super.* at 172, 254 *A.*2d 538. "The hearsay statement need not be contemporaneous with the startling event . . . as long as there is a showing that the interval was brief and the excited state of the declarant continued." *State v. Clark,* 347 *N.J.Super.* 497, 506, 790 *A.*2d 945 (App.Div.2002) (citations omitted). Courts must use a fact-specific analysis to determine whether a statement made after a specific period of time will qualify as an excited utterance. *State v. Lyle,* 73 *N.J.* 403, 411–13, 375 *A.*2d 629 (1977) (holding that hearsay statement of victim was admissible where victim escaped defendant and two minutes later described defendant's acts to his sister); *State v. Lazarchick,* supra, 314 *N.J.Super.* at 524, 715 *A.*2d 365 (holding that victim's statement to mother was excited utterance despite delay of approximately one hour after startling encounter with police officers); *State v. Bass,* 221 *N.J.Super.* 466, 482–83, 535 *A.*2d 1 (App.Div.1987) (holding that declaration by five-year-old eyewitness to his brother's murder six hours after the event was "truly spontaneous and made solely under stress of nervous excitement"), *certif. denied,* 110 *N.J.* 186, 540 *A.*2d 182 (1988); cf. *State v. Williams,* supra, 106 *N.J.Super.* at 173, 254 *A.*2d 538 (holding that delay of twenty minutes prevented defendant's statements from being spontaneous). Thus, even a somewhat lengthy delay will not always prevent a statement from being admissible under Rule 803(c)(2). Rather, the Rule focuses on whether nervous excitement was generated, whether there was a reasonable proximity in time between the event and the declarant's subsequent description of it, and whether there was a lack of opportunity to

deliberate or fabricate the circumstances. *State v. Lyle, supra,* 73 *N.J.* at 413, 375 *A.*2d 629.

Viewing defendant as the declarant when she made the statements to Tracey, the record does not satisfy the standard established under *N.J.R.E.* 803(c)(2). Both statements were deliberately fabricated by defendant and were not made under any stress related to the occurrence of a startling event. Therefore, the required fact-specific analysis concerning defendant-declarant cannot be satisfied.

To the extent that the admissibility of those statements turns on Tracey's mental state at the time she told Irene what defendant had said to her about Mabel's fall and death, see *State v. Machado,* 111 *N.J.* 480, 487, 545 *A.*2d 174 (1988), *Rule* 803(c)(2) has been satisfied. As noted previously, Tracey had no reason to misrepresent what defendant had told her. She repeated the statements to her mother almost contemporaneously as she heard them over the telephone. The August 27 and August 28 statements were startling to Tracey because she exclaimed, "Oh my God," "Oh I'm so sorry," and asked, "Is there anything I can do?" Clearly, those facts demonstrate that Tracey was under the stress of excitement caused by defendant's statements to her that Mabel, her friend's mother, had fallen and died. There was no opportunity for Tracey to fabricate before recounting the statements to Irene. We hold, therefore, that Tracey's statements to Irene concerning what defendant had told Tracey are admissible under *Rule* 803(c)(2) exception to the hearsay rule.

### III.

Next, we address whether the statements that are admissible under the *res gestae* (state of mind) exception to the hearsay rule, *N.J.R.E.* 803(c)(3), and the excited utterance exception, *N.J.R.E.* 803(c)(2), are subject to a balancing under *N.J.R.E.* 403, *N.J.R.E.* 404(b), or both. Defendant's statements to Tracey are admissible to establish defendant's motive for murdering Tracey. Because the motive evidence is not being admitted as

other-crime evidence, there is no need to conduct a *Rule* 404(b) analysis. The Rule addressing the admissibility of other-crime evidence, *N.J.R.E.* 404(b), "does not apply to uncharged acts of misconduct that are components of the crime that is the subject of the trial." *State v. Martini, supra,* 131 *N.J.* at 241, 619 *A.*2d 1208; *State v. Byard,* 328 *N.J.Super.* 106, 113–14, 744 *A.*2d 1213 (App. Div.), *certif. denied,* 165 *N.J.* 490, 758 *A.*2d 649 (2000); *State v. Cherry, supra,* 289 *N.J.Super.* at 522, 674 *A.*2d 589; *State v. Ortiz,* 253 *N.J.Super.* 239, 243–44, 601 *A.*2d 735 (App.Div.), *certif. denied,* 130 *N.J.* 6, 611 *A.*2d 646 (1992). Here, the motive evidence relates to Tracey's murder rather than any uncharged acts of misconduct related to Mabel's death. However, both *res gestae* (state of mind) evidence and evidence admissible pursuant to the excited utterance exception to the hearsay rule are subject to *Rule* 403 balancing.

The purpose of a *Rule* 403 balancing is to determine whether the risk of prejudice to defendant in admitting the motive evidence outweighs its probative worth. The State contends that defendant's motive for killing Tracey was to prevent Tracey from implicating defendant in her mother's death based on what defendant told Tracey about the death of Mabel three days before Mabel died. Although the emphasis will not be on defendant's criminal responsibility for the death of her mother, that evidence will likely raise a suggestion or an inference in the minds of jurors regarding defendant's culpability for her mother's death. For that reason, the probative value prejudicial impact analysis under *Rule* 403 and *Rule* 404(b) are the same. We, therefore, look to the standard articulated by this Court in the seminal case of *State v. Cofield.*

*Cofield* established the following four-part test to determine when other-crime and civil-wrong evidence is inadmissible:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*State v. Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230 (citation omitted).]

"[T]he balancing test of *Cofield's* fourth prong ... incorporates the traditional balancing test of *Rule* 403." *State v. Hernandez,* 170 *N.J.* 106, 127, 784 *A.*2d 1225 (2001). That prong requires the State to establish that the probative value of the statements made by defendant to Tracey are not outweighed by its apparent prejudice. Whether the proffered evidence of defendant's motive for murdering Tracey is "outweighed by its prejudicial effect on defendant must be pragmatically evaluated in the context in which that evidence [will be] offered." *State v. Marrero,* 148 *N.J.* 469, 491, 691 *A.*2d 293 (1997); *State v. Stevens,* 115 *N.J.* 289, 303, 558 *A.*2d 833 (1989).

Historically, motive evidence has been treated differently by our courts even under a *Rule* 404(b) analysis:

New Jersey courts generally admit a wider range of evidence when the motive or intent of the accused is material. That includes evidentiary circumstances that "tend to shed light" on a defendant's motive and intent or which "tend to fairly explain [a defendant's] actions," even though they may have occurred before the commission of the offense [for which the defendant is on trial].

[*State v. Covell,* 157 *N.J.* 554, 565, 725 *A.*2d 675 (1999) (citing and quoting *State v. Rogers,* 19 *N.J.* 218, 228, 116 *A.*2d 37 (1955)).]

Although this Court has imposed a stringent standard for the admission of other-crime evidence, our courts have not frequently excluded highly prejudicial evidence under the fourth prong of *Cofield.* In *State v. Morton,* 155 *N.J.* 383, 452, 715 *A.*2d 228 (1998), *cert. denied,* 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001), a capital case involving the felony murder of a gas station attendant, the State was permitted to introduce testimony that the defendant and a co-defendant had planned to rob a bank or another gas station prior to the murder for which they were on trial. That evidence was introduced to prove the defendant's state of mind. *Ibid.* In *State v. Marrero, supra,* 148 *N.J.* at 490–91, 691 *A.*2d 293, evidence that the defendant was awaiting sentencing on an earlier sexual assault was admissible to establish a motive for killing a subsequent aggravated-sexual-assault victim to avoid an

enhanced prison term on the first assault. In *State v. Nance*, 148 *N.J.* 376, 388–90, 689 *A.*2d 1351 (1997), we held that evidence that the defendant was jealous of the victim was admissible to prove his motive for murder. In *State v. Martini, supra*, 131 *N.J.* at 339–42, 619 *A.*2d 1208, another capital case, this Court did not find too prejudicial evidence that defendant had made threats against the murdered victim's wife prior to the murder. In *State v. Erazo*, 126 *N.J.* 112, 130–31, 594 *A.*2d 232 (1991), another capital case, the State was allowed to introduce evidence of a prior eleven-year old murder to establish motive, namely that the defendant killed the victim to prevent her from causing a revocation of his parole from his sentence on the earlier conviction. This Court allowed the use of that evidence as "necessary to prove the State's theory of [the] defendant's motive." *Id.* at 131, 594 *A.*2d 232.

The Appellate Division has rendered similar holdings. *E.g., State v. T.C.*, 347 *N.J.Super.* 219, 231–36, 789 *A.*2d 173 (App.Div. 2002) (holding that evidence of defendant's earlier abuse of her child was admissible to show intent and prejudice did not outweigh probative value); *State v. Cusick*, 219 *N.J.Super.* 452, 464–67, 530 *A.*2d 806 (App.Div.) (holding that evidence defendant had sexually assaulted three six-year old girls was admissible to establish motive, intent and absence of mistake in subsequent trial for aggravated assault on eight-year old girl), *certif. denied*, 109 *N.J.* 54, 532 *A.*2d 1118 (1987).

 Notwithstanding the fact that the Appellate Division found the risk of undue prejudice high in this case, the State argues that "any evidence which logically tends to show a motive, or which fairly tends to explain the conduct of the accused, should be permitted," and "evidence as to motive is admissible even though it may be prejudicial in the sense that it will arouse or inflame the jury against the defendant." *State v. Carter*, 91 *N.J.* 86, 102, 106, 449 *A.*2d 1280 (1982) (quoting 1 *Wharton on Criminal Evidence* § 170, at 316–18 (13th ed.1972)). "Evidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory poten-

tial as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." *State v. Koskovich,* 168 *N.J.* 448, 486, 776 *A.*2d 144 (2001) (quoting *State v. Thompson,* 59 *N.J.* 396, 421, 283 *A.*2d 513 (1971)). "The mere possibility that evidence could be prejudicial does not justify its exclusion." *State v. Morton, supra,* 155 *N.J.* at 453–54, 715 *A.*2d 228. Certainly, the motive evidence sought to be introduced in this case is, at the very least, no more prejudicial than the objectionable evidence permitted in cases such as *Morton, Marrero, Nance, Martini, Erazo, T.C.* and *Cusick.* Furthermore, "certain types of evidence, including evidence of motive or intent, 'require a very strong showing of prejudice to justify exclusion.'" *State v. Koskovich, supra,* 168 *N.J.* at 486, 776 *A.*2d 144 (quoting *State v. Covell, supra,* 157 *N.J.* at 570, 725 *A.*2d 675).

In deciding whether to exclude evidence based on its potential for prejudice, "a court must consider the availability of other evidence that can be used to prove the same point." *State v. Covell, supra,* 157 *N.J.* at 569, 725 *A.*2d 675. Probative value is enhanced by the absence of such other evidence. *Ibid.; State v. Stevens, supra,* 115 *N.J.* at 303, 558 *A.*2d 833 (requiring trial courts to consider whether other evidence can serve same purpose for which other-crime evidence is proffered). On the other hand, relevant evidence loses some of its probative value if there is other less inflammatory evidence available to prove that point. *State v. Covell, supra,* 157 *N.J.* at 569, 725 *A.*2d 675; *State v. Chavies, supra,* 345 *N.J.Super.* at 273–74, 785 *A.*2d 1 (finding that portions of murder victim's diary about her pregnancy and defendant's illegal use of her credit cards was highly prejudicial and should not have been admitted because other less prejudicial evidence existed to demonstrate same facts).

We acknowledge that the introduction of defendant's statements will likely create some prejudice, but the evidence regarding motive has extremely high probative value. That high probative value and the absence of any other source to establish motive must be weighed pragmatically against the reality that "[v]irtually any

evidence of 'other crimes' will probably entail some risk of prejudice to a defendant." *State v. Mazowski*, 337 *N.J.Super.* 275, 287, 766 *A.*2d 1176 (App.Div.2001). Similarly, "[t]hat evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself [or herself], if the evidence be believed, [is admissible if] inextricably entwined with the material facts." *State v. West*, 29 *N.J.* 327, 335, 149 *A.*2d 217 (1959).

Our conclusion that the motive evidence should not be excluded under *Rule* 403 is influenced by the fact that there is no other less prejudicial evidence available to establish defendant's motive for killing her friend. The absence of less prejudicial evidence to establish motive enhances the probative value of the motive evidence because it is "necessary to prove the State's theory of defendant's motive," *State v. Erazo, supra*, 126 *N.J.* at 131, 594 *A.*2d 232, for murdering a friend when the surrounding circumstances of the crime make it difficult to infer a motive. In arguing against the admissibility of the motive evidence, defendant points out that she has never been charged for any crime relating to the death of Mabel Long, and the cause of her death remains undetermined. Those same arguments also have the potential of reducing the prejudice to defendant.

█ We hold that the fourth prong of the *Cofield* test has been satisfied and that Irene Roche can testify regarding statements made by defendant to Tracey Roche on August 26 and 27 regarding Mabel Long's fall and her death. Notwithstanding the fact that generally no limiting instruction is necessary insofar as *res gestae* evidence is concerned, *State v. Martini, supra*, 131 *N.J.* at 242, 619 *A.*2d 1208, we direct the trial court to give the jury an appropriate instruction limiting the use of the motive evidence because this case involves both the *res gestae* and the excited utterance exceptions to the hearsay rule. In addition, a limiting instruction helps to ensure that the prosecutor does not use the motive evidence improperly during summation.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for trial.

PORITZ, C.J., concurring.

Like my colleagues, I would admit the statements made by defendant to Tracey on August 27 and 28 under *N.J.R.E.* 803(c)(2) and (3). I write separately to note that although the *res gestae* principle, standing alone, has been discredited by scholars as a basis to admit otherwise inadmissible evidence, where, as here, its use is tethered to specific Evidence Rules, it remains a useful interpretive tool.

Justice LONG joins in this concurrence.

STEIN, J., concurring in part, dissenting in part.

I join in the Court's determination that the August 27 and August 28 statements made by defendant to Tracey are admissible under the state of mind exception to the hearsay rule. *N.J.R.E.* 803(c)(3). However, I disagree with the majority's use of the archaic, catch-all phrase *res gestae* to describe an exception to the hearsay rule that has been codified precisely under our evidence rules.[1] Moreover, I am not persuaded by this record that the victim's reaction to defendant's August 27 and August 28 phone calls appropriately can be characterized as an excited utterance.

*Res gestae,* the Latin phrase meaning "things done," can be used to refer to the events surrounding the issue being litigated, or "other events contemporaneous with them." Black's Law Dictionary (7th ed.1999). The phrase may have made its first appearance "as early as 1637[but] was not in common use until the early nineteenth century." Chris Blair, *Let's say Good-bye to Res*

---

[1] With the benefit of hindsight, I must acknowledge that I have been remiss in previously joining opinions that applied *res gestae* without expressing the reservations about its contemporary use that I advance in this opinion. See, e.g., *State v. Schumann,* 111 *N.J.* 470, 545 A.2d 168 (1988)

*Gestae,* 33 *Tulsa L.J.* 349, 349 (1997). Although "the phrase initially developed as an exception to the hearsay rule for statements [that] were associated with the happening of the principal litigated event, such as a murder, a collision, or a trespass," eventually it " 'seemed to embody the notion that evidence of any concededly relevant act or condition might also bring in the words which accompanied it.' " *Id.* at 349–50. Over the years the *res gestae* exception has evolved into several different exceptions, including the "present sense impressions, excited utterances, and statements of then existing mental, emotional, or physical condition ... [or] words that we now would refer to as verbal acts or verbal parts of acts." *Id.* at 350. *Res gestae* also has been "used to explain the admissibility of evidence of uncharged misconduct." *Ibid.* Although not admissible to show that a "defendant acted in conformity with his character," uncharged misconduct evidence can be used where "the uncharged misconduct was a part of a single criminal episode and [ ] the jurors could not adequately evaluate the charged crime without the contextual evidence provided by the uncharged misconduct." *Id.* at 350–51.

Use of the *res gestae* term has been criticized by commentators who find the term to be archaic and largely superseded by specific exceptions set forth in the evidence rules. One commentary has described *res gestae* as "a confusing and much discredited common law concept" that once served as "a substitute for reasoning and careful analysis." Virginia M. Klemme & Dennis D. Prater, *Res Gestae Raises Its Ugly Head,* 65 *J. Kans. Bar Ass'n* 24, 27 (1996). Yet another discusses how the phrase has outlived its usefulness:

> Although the phrase may have played some beneficial role in the development of the law of hearsay and uncharged misconduct evidence, it has been widely criticized for being useless and harmful. *It is useless because the concepts included within res gestae can all be explained by reference to other more refined principles of evidence law. It is harmful because it causes confusion of evidentiary principles and acts as a deterrence to principled analysis of evidentiary concepts.*
>
> [Blair, *supra,* 33 *Tulsa L.J.* at 349 (emphasis added).]

Endorsing its repudiation, *Wigmore On Evidence* adds:

> The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been

applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology.

[6 *Wigmore on Evidence* § 1767, at 255 (Chadbourn rev.ed.1976).]

Agreeing that the phrase *res gestae* no longer enjoys contemporary respect and recognition among courts and scholars, *McCormick on Evidence* suggests that it can "be jettisoned, with due acknowledgment that it served an era in the evolution of evidence law." *McCormick on Evidence* § 268, 196 (Strong ed., 5th ed.1999). That source observes that *res gestae* once made it easier for "courts to broaden its coverage and thus permit the admissibility of certain statements in new situations," but suggests that "the law has now reached a stage where expanding admissibility is better done in other ways." *Ibid.*

Some federal courts either explicitly or impliedly have expressed disapproval of the continued reference to *res gestae* in evidence law. The Seventh Circuit in *Stephens v. Miller*, 13 *F.*3d 998, 1003 (1994), for example, after acknowledging that other federal courts have "described the phrase *res gestae* as useless, harmful, and almost inescapable of a definition," noted that "for purposes of the Constitution and federal law, the term *res gestae* is without significance." The Third Circuit in *Miller v. Keating*, 754 *F.*2d 507, 509 (1985), stated that "[a] declaration sought to be admitted must qualify under one of the genuine exceptions to the hearsay rule" because "[t]he old catchall, 'res gestae,' is no longer part of the law of evidence."

Federal courts are not alone in articulating their dissatisfaction with the phrase *res gestae*. See, e.g., *Andrews v. State*, 249 *Ga.* 223, 290 *S.E.*2d 71, 74 (Ga.1982)(acknowledging overwhelming criticism of res gestae although deciding ultimately not to abandon "traditional discussions concerning res gestae," at least in present case); *Berryhill v. State*, 726 *So.*2d 297, 300 (Ala.Crim.App.1998)(" 'Although . . . nearly always referred to or described in the Alabama decisions as being a part of the res gestae, it is submitted that the terms 'spontaneous exclamation'

and 'excited utterance' are preferable because the words 'res gestae' have been used to signify so many different things that their use is calculated to promote confusion as to the proper scope of the present exception.' ")(quoting Gamble, *McElroy's Alabama Evidence,* § 265.01(1) at 1281 (5th ed.1996)); *B & K Rentals and Sales Co., Inc. v. Universal Leaf Tobacco Co.,* 324 *Md.* 147, 596 *A.*2d 640, 644 (Md.1991)("We agree ... that 'this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking.' "); *Bynote v. National Super Markets, Inc.,* 891 *S.W.*2d 117, 121 (Mo.1995)(en banc)(disapproving of parties "free use of the term," and stating that "[t]he phrase is virtually meaningless in determining what a trial court means when it permits testimony on the basis of the *'res gestae'* exception to the hearsay rule"); *Evert v. Swick,* 300 *Mont.* 427, 8 *P.*3d 773, 777 (Mont.2000)(" 'The phrase res gestae, in itself, adds nothing but confusion to an already complex area of the law. The better practice is to abandon the use of the phrase altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented.' ") (citations omitted); *State v. Hafford,* 410 *A.*2d 219, 220 (Me.1980)(finding "occasion to express [ ] disapproval of the use of the term *[r]es gestae,*" and stating that "[c]ontinued use of that label by the bench and bar would serve only to confuse and mislead"); *State v. L.P.,* 338 *N.J.Super.* 227, 241, 768 *A.*2d 795 (App.Div.), *certif. denied,* 170 *N.J.* 205, 785 *A.*2d 434 (2001)(Wefing, J., concurring)(writing separately "because of [her] disquiet with the concept of *res gestae* " to describe evidence that was not so intimately part of chain of events forming charge for which defendant was convicted).

The principles that historically have comprised the *res gestae* exception have been codified, but without use of the words *"res gestae."* Characteristic of the imprecision that accompanies continued reliance on the phrase *res gestae* is the majority's reference to *res gestae* as the state of mind exception now codified at *N.J.R.E.* 803(c)(3). *Ante* at 153 and 157, 801 *A.*2d at 230 and 232.

However, as noted, the *res gestae* concept has been superseded by four separate hearsay exceptions: present sense impressions, excited utterances, present bodily conditions, and present mental states and emotions. Because those principles have been codified by specific exceptions, the Court would be better served by abandoning continued reference to the phrase *res gestae* and replacing it with the precise analysis contemplated by our Rules of Evidence.

I also question the majority's determination that the August 27 and August 28 statements are admissible under the excited utterance exception. *N.J.R.E* 803(c)(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or the condition and without opportunity to deliberate or fabricate." Although the majority correctly observed that Tracey likely had "no opportunity [ ] to fabricate before recounting the statements to Irene," *ante* at 160, 801 *A*.2d at 234 in my view, defendant's statements to Tracey were not sufficiently "startling" to justify their admission under the excited utterance exception.

"The assumption underlying this exception is that a person under the sway of excitement precipitated by an external event will be bereft of the reflective capacity essential for fabrication." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence Manual* § 16.02[01](1987). To come within the exception, the rule requires that the declarant not have had the opportunity to fabricate, but also contemplates that the statements were made in response to something unexpected and shocking that the person has perceived or participated in so as to cause an uncontrollable emotion. "[T]here must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer." *McCormick on Evidence, supra,* § 272, at 204.

Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 803(c)(2) states:

Note that while the present Rule speaks to statements "relating to" a startling event and eliminates the explicit requirement of the former rule that the declar-

ant's excitement be caused by the perception of the startling event, leaving open the possibility under the new formulation that an admissible statement could be made by a person excited by an event which was reported to him but which took place outside his personal perception, it was the intention of the drafters to replace the former rule without substantive change.... It is therefore submitted that the present perception requirement remains implicit in the Rule.

"If the requisite excitement is lacking then statements cannot be admissible under the rule regardless of how close to the time of the starling event they were made." *Ibid.* Normally, the sufficiency of the event or occurrence is easily resolved where the declarant is involved in or observes the event, such as an automobile accident, a fight or an attack by a dog. *McCormick on Evidence, supra,* § 272, at 205. In deciding whether the event or occurrence is sufficiently startling, "courts look primarily to the effects upon the declarant" of the statement, *id.* at 206 or the "shock value of the event in question," Weinstein, *supra,* at § 16.02[02].

The majority concludes that the challenged statements are admissible, assuming that Tracey was under the "stress of excitement" caused by defendant's recitation of the August statements to Tracey. *Ante* at 160, 801 *A.*2d at 234. It reasons that because Tracey had "no reason to misrepresent what defendant had told her" and because she repeated them "almost contemporaneously as she heard them over the telephone," those facts "[c]learly ... demonstrate that Tracey was under the stress of excitement caused by defendant's statements" to her that defendant's mother had fallen and died. *Ibid.* Although those factors are relevant in proving the reliability of the challenged statements, they do not necessarily demonstrate that Tracey was under sufficient stress or under any stress when those statements were made. In any event, the Court's conclusion that the statements are admissible pursuant to the state of mind exception is well supported, and reliance on the excited utterance exception is not necessary.

*For reversal and remandment*—Chief Justice PORITZ, Justices COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—6.

*Concurring*—Chief Justice PORITZ and Justice LONG—2.

*Concurring in part; dissenting in part*—Justice STEIN—1.