No. 89.—SOLOMON HART, administrator, &c. plaintiff in error, vs. ROSWELL POWELL, defendant in error.

[1.] Declarations of the defendant, made immediately after the fact as to the circumstances under which he killed a runaway slave, are admissible in evidence; and when the precise time which intervened between the homicide and the statements cannot be ascertained, it may be left to the Jury to determine whether they were made without premeditation or artifice, and without a view to the consequences, or were merely made to color the transaction.

Trespass, in Upson Superior Court. Tried before Judge STARKE, May Term, 1855.

This was an action of trespass brought by Absalom C. Cleveland, in his life time, against Roswell Powell, for the recovery of the value of a negro man slave, Bill, the property of the said Cleveland.

The questions in the case arose upon the admissibility of certain testimony. It appeared in evidence that the slave was run away; that application was made to the defendant, who owned track dogs, to go with his dogs, for the purpose of trailing and capturing the negro; that he did so; and, after pursuing him for some time, he came up with him; a contest ensued between the defendant and the slave, which resulted in the defendant's shooting and killing him.

On the trial, the defendant introduced, as a witness, James

H. Stafford, who testified, " that he started, in company with the defendant, after the negro. The last witness saw of defendant he was ahead, about a mile and a half from the point where the negro was killed. In heading a branch, witness got behind; he broke his girth, and stopped for a short time to mend it. He was directed to the place of the killing by the blowing of the horn. When witness reached the place, some two or three persons were present; the negro was in the head of the swamp; the defendant was some thirty or forty steps from the negro, on the side of the of swamp; the negro had been shot. Some half an hour had intervened from the time witness last saw defendant, as stated above, until he came to the place where the negro had been shot."

Defendant here proposed to prove by the witness, the sayings of defendant about the killing of the negro. Plaintiff objected. The Court over-ruled the objection, and plaintiff excepted.

The witness then stated, " that when he came up to where the negro had been shot, that the defendant said he had, of necessity, to shoot the negro, and he feared he had killed him; and if he had, he would not have done it for all the negroes on the earth," &c. The witness proceeded to give, in detail, all the sayings of the defendant at the time, in reference to the killing, going to show that the negro had a knife and a stick; had cut three of the dogs; and finally turned, and made an attack upon the defendant; and that he was forced, in self-defence, to shoot him.

· The defendant then introduced Jonathan Stamps, who testified, " that he went from his field to help take the negro. When he got within seventy-five yards of the place, he heard some one call twice, saying, ' go after the doctor, for I think I have killed a negro.' When witness got to the fence, he met the defendant, who told witness that he was afraid he had killed a negro; said he had to do it to save his own life; that if he could have helped it, he would not have done it for all the negroes on the earth;" and the witness proceeded to detail all the sayings of the defendant at the time, going to

·show that it was in self-defence he killed the negro. To which testimony plaintiff objected. The Court over-ruled the objection, and plaintiff excepted.

HAMMOND; STUBBS & HILL, for plaintiff.

O. C. GIBSON, for defendant.

The Court not being unanimous, delivered their opinions *seriatim.*

LUMPKIN, J.

The facts in this case are these: Bill, a negro fellow about twenty-five years old, and worth $1.000, had runaway from his owner, Absalom C. Cleveland, deceased, the intestate of the plaintiff, in 1852. His master resided in Marion County. It was in proof, by the testimony on the part of the plaintiff, that he was a negro of violent character, and considered a dangerous man in the neighborhood. He had knocked several negroes in the head; had been absent for sometime; and Mr. Cleveland admitted that he had had a difficulty with some one who had tried to catch him, and had " made fight upon his pursuer with a stick."

Being found lurking about a plantation in Upson County, having been run off from the fodder-house on the farm of Mr. Stafford, a little before day in the morning, application was made to the defendant to track him with his dogs, which were trained for that purpose. Mr. Powell being in feeble health, objected to going, but finally yielded, with the understanding that some one else must do the running, as he was unable. Mr. Stephens, a neighbor, was sent for to assist.

When the dogs first struck the track, all the party started together. The defendant did not attempt to keep up; and Stephens was bothered to keep the dogs on the trail. When they got the scent the second time, (after having lost it,) and led off, Powell followed. The last that was seen of him, he

was a mile and a half distant from the place where the negro was killed; and a half hour intervened before the witness, Stafford, came up—being directed to the spot by the blowing of the defendant's horn. When he got there, Powell and the two Howells were present. The negro was lying in the head of the branch and the defendant standing on the side of the swamp, about 40 steps off. A physician was sent for as soon as possible. The negro was taken up by the company—Powell assisting—and removed to a higher place. It was a muddy, marshy spot were he was lying, interspersed with turf. One, with care, could keep out of the mud, but not if he was in haste. The ground was stirred and the bushes bent, as though there had been a scuffle where the negro lay. The defendant was informed, in the morning before starting, that Bill had a knife and a stick, which induced him to get his pistol. Bill was a man of ordinary strength, weighing 150 lbs. The account that the defendant gave of the matter was, that the negro had killed one of the dogs and disabled the balance, that were capable of doing any thing; that refusing to submit, he shot, at first, to disable him, hitting him in the thigh; that he fired a second time, and missed; when the negro, advancing upon him, a conflict ensued, and he discharged the third load with his revolver. After the negro was removed, the stick was picked up, and the knife found in the mud where he was lying. The knife had blood upon it.

There were two gun-shot wounds—one through the flesh of the thigh, entering about four inches above the knee, and passing on the inside of the bone, ranging upwards and backwards; the other entered the back, about one inch to the left of the spine, about the fifth bone of the dorsal column, and ranging upwards to the left side, below the collar bone, about the middle.

The only question in this case is, were the declarations of the defendant competent evidence?

Mr. *Greenleaf* says: " There are other declarations which are admitted as original evidence, being distinguished from hearsay, by their connection with the principal fact under

Hart, adm'r, &c. *vs.* Powell.

investigation.   The affairs of men consist of a complication
of circumstances so intimately interwoven, as to be hardly sep-
arable from each other.   Each owes its birth to some pre-
ceding circumstance, and in its turn, becomes the prolific
parent of others; and each, during its existence, has its in-
separable attributes and its kindred facts, materially affecting
its character and essential to be known, in order to a right
understanding of its nature.   These surrounding circumstan-
ces constituting a part of the *res gestæ*, may always be shown
to the Jury along with the principal fact; and their admissi-
bility is determined by the Judge, according to the degree of
their relation to that fact; *and in the exercise of his sound
discretion*, it being extremely difficult, if not impossible, to
bring this class of cases within the limits of a more particular
description." (1 *Greenlf. Ev.* §108.)

True, the principal point to be observed in all cases is,
whether the declarations offered in proof were cotemporane-
ous with the main fact under consideration; for if they are
merely the narrative of a past occurrence, they cannot be re-
ceived in evidence: still, much latitude of discretion is allowed
to the Courts.   And if the statements tend to illustrate the
issue and to assist the judgment which is to be formed
upon the whole matter; if the declarations derive a degree
of credit from their connection with the surrounding circum-
stances, and independently of any credit to be attached to the
speaker, they should, in such cases, be admitted in evidence.

What time elapsed between the homicide and the account
given of it to the witnesses, it is impossible to assume with
any degree of accuracy.   It was certainly less than thirty
minutes; because Stafford and Powell parted a half hour on-
ly before the killing, and Powell had to go one mile and a
half before he came up with the boy.   When the rest of the
company arrived, the negro is found dead in the swamp at the
head of the branch, to which point he was pursued by the
dogs; he is not torn or lacerated; the dogs are cut so as to
be disabled from aiding in the capture; his stick and knife
are by his side; there are signs of a scuffle having taken

place where the body lay, and Mr. Powell, at the distance of some forty steps, is blowing his horn to attract his companions, and calling out for a physician to be sent for, for that he fears he has killed Bill, and that he would not have done so for all the negroes above the earth; and he proceeds to relate the facts and circumstances of the killing.

We ask, do not his declarations elucidate the facts with which they were connected? Were not the Jury authorized to believe that they were made without premeditation or artifice, and without a view to the consequences? We think so, unquestionably.

Direct proof, in such a case, is impossible. The defendant, himself, was the only witness of the facts which constituted his defence. Not having anticipated the catastrophe, no prudence, no sagacity, no foresight, could have prompted the defendant to have prepared himself with evidence to prove his innocence. It is a hard rule of law which presumes every homicide to be murder, and imposes upon the accused the burden of showing that the offence is of a mitigated character. It is equally hard to close the mouth of the prisoner from testifying as to the facts attending the homicide, when no other evidence can be adduced—a principle known only to the Common Law.

But to hold that this defendant could not exculpate himself by his own statement of the facts, and to leave him without redress, to be multced in damages, and to pay the highest penalty known to the law, for reluctantly undertaking the performance of a high duty, through mere kindness, would be cruel indeed. We do not say that the Jury were bound to believe the explanation. All such statements should be weighed with candor, but with circumspection. The party may not have acted in self-defence; he may have shot the negro in a spirit of revenge, and to save his dogs; the character of the wounds may contradict his statement. All this and much more may be true; for we are aware that the defendant was under a strong temptation to give a favorable, not to say false, coloring to the case. All this, however, was

Hart, adm'r, &c. vs. Powell.

for the Jury. It was for them to determine whether his account was natural and consistent with the circumstances, or otherwise, and a mere sham.

In criminal proceedings, the declarations of prisoners have been received to explain their conduct, as in an indictment for larceny, that he took the goods, claiming the property. (1 *Hale's Pl. Cr.* 509. 2 *Barn.* 174.) The Jury hear the evidence, and then judge whether these declarations were genuine claims of property, though mistaken, or made to color a stealing. In trials for murder, declarations of the prisoner, antecedent to the fact, are admissible to reconcile or explain his conduct, and to discover *quo animo* the fact was committed. And in the hottest times in trials for high treason, the declarations of a prisoner have been admitted in evidence to explain his acts. (*Howell's State Trials, passim.*) Under any view of this case, I should be unwilling to disturb the verdict of the Jury. *This slave was in a state of revolt, as every slave is when in open and forcible resistance to lawful authority.* His pursuer had a right to arrest him. (*Cobb's Digest,* 976, 1020.) He was in the performance of a meritorious service. The negro's character was notoriously daring and dangerous. He was armed with a knife and a bludgeon, the latter of which he had already used to prevent a previous attempt to capture him. Under these circumstances, I should not feel inclined to scrutinize, with surgical skill, the direction of the wounds, in order to ascertain how the boy was killed; nor to determine, with mathematical precision, the number of minutes which transpired between the killing and the declarations. Indeed, the course of balls is frequently so extraordinary, that I should be exceedingly reluctant to bankrupt any man in fortune and character, upon a mere hypothesis. I entertain the most profound respect for the medical profession; and yet, it must be admitted that theory and fact do not always harmonize as to gun-shot wounds. "*Amicus Plato, Amicus Socrates, sed magis amica veritas.*"

It is related by Dr. Hennen, as having occurred to a friend

Hart, adm'r, &c. vs. Powell.

of his in the Mediterranean, that a ball which struck about the *pomum adami*, travelled completely round the neck, was found lying in the very orifice at which it had entered. The same author states, that in one instance which occurred in a soldier, who having his arm extended in the act of endeavoring to climb up a scaling ladder, had the centre of his shoulder pierced by a ball, which immediately passed along the limb and over the posterior part of the thorax, coursed along the abdominal muscles, dipped deep through the hypogastric artery, and presented itself on the forepart of the opposite thigh, about midway down.

Now we have often heard of an individual being "*shot all to pieces*," but never before by one ball. Who would have doubted—what adept in the science would not have testified—that this poor fellow had been shot a half dozen times?

In another case, a ball which struck the breast of a man standing erect in the ranks, *lodged in the scrotum!* The gallant and ever to be lamented Col. Craig, was shot in the back at Cerro Gordo; the ball pursued a circuitous route around his body, on the outside of the skin, to the breast.

But we forbear to multiply examples. We are sustained by the highest medical authority, in asserting that balls take very unusual courses, "not at all to be accounted for by any preconceived theories drawn from the doctrine of projectiles, nor to be explained by any diagrams formed upon mathematical rules." (*Med. Jur. by J. H. Paris, Fellow of the Royal College of Physicians, and Q. S. M. Fonblanque, Esq. Barrister at Law,* 2 *Vol.* 126.) "These considerations," continue the learned authors, "ought to render the surgeon very cautious how he delivers his opinion *as to the direction the shot was fired.*"

We would remark, in conclusion, that evidence must accommodate itself, and it is constantly doing so, to the state of society and the concerns of the world around us. That the statements of Powell were made a very short time, if not directly, after the homicide, is plainly proven. To preclude this proof, would be to shut out the party's only defence. It

Hart, adm'r, &c. *vs.* Powell.

was the immediate promulgation of the homicide, and the facts attending it. For myself, I am perfectly prepared to meet the responsibility of such a precedent, and to hold that the Court below, *under the circumstances of this case,* did not err in admitting the testimony to which the plaintiff has excepted.

BENNING, J.—concurring.

I think it was right to admit the evidence.

The sayings must have been uttered within less than thirty minutes after the shooting; they may have been uttered within five or two. They were uttered before the defendant left the place of the occurrence. What we know is, that these sayings must have been uttered very soon after the doing of the act they went to explain; how soon afterwards they were uttered, is what we do not know. If there is a doubt as to the admissibility of evidence, I think the side for admitting the evidence ought to have the benefit of the doubt. Suppose such evidence admitted, are the Jury obliged to believe it? Surely we may trust such evidence to twelve men of average sense, with their wits sharpened by the opposing arguments of Counsel, and their frailty of judgment rectified by the charge of a Court. (11 *Ga. R.* 621, 13 *do.* 65, 1 *Green. Ev.* §108.)

STARNES, J.—dissenting.

I cannot bring my mind to the conclusion that this testimony was a part of the *res gestæ* of this transaction.

I know that it is difficult to define what does always constitute the *res gestæ*—that it is almost impossible always to determine what is precisely the necessary contemporaneousness in the circumstances or declarations, which it is thought serve to elucidate the main fact under consideration.    And that the admissibility of these has to be entrusted very much, as Mr. *Greenleaf* suggests, (1 *Greenl Ev.* 108,) to the Judge, " in the exercise of his sound discretion." But whilst I recognize this difficulty, I think I see, very clearly, where there is no difficulty, and that is in never admitting the declarations of a party in interest, as part of the *res gestæ*, where they are not plainly, impulsively made, and where it is not clear that they were made without premeditation or artifice.

Declarations of a party are admitted in evidence as part of the *res gestæ*, only upon the presumption that they elucidate the facts with which they are connected, having been made without premeditation or artifice, and without a view to the consequences.   (1 *Stark. Ev.* 49.   *Scaggs vs. The State,* 8 *Smead. & M.* 726.)   Where such declarations are merely *narrative of a past occurrence,* they cannot be received as proof of the existence of such occurrence.   (1 *Greenl. Ev.* 110.)

This is certainly a safe and wise rule, if it be safe and wise to exclude hear-say testimony, and the declarations of a party in interest, as to his own case.  And to my mind, it is quite clear that the declarations of the defendant in error, in this case, do not fall within this rule.

It is admitted that the witnesses who speak to these declarations of Powell, did not come up to him after the slave was killed, until some minutes had elapsed.   But it is said that Stafford, the principal of these witnesses, must have arrived a very few minutes after the slave's death—so shortly as to render what the defendant in error said to him, a part of the

transaction.   The matter, however, remains in doubt, according to this proposition.   It is not entirely clear, that the witness did arrive in a very few minutes after the death of the slave ; and I am strongly impressed with the opinion, that in such a case, the Court should not permit a party to make testimony for himself, unless the transaction and the declarations are clearly shown to be contemporaneous.

It was said that this might have been submitted to the Jury.   But it is the province of the Judge to determine what is evidence for the Jury, and especially such evidence as this ; and he should have found it evidence proper for the Jury, as I think, before he submitted it to them.

But if it be admitted that the witness did arrive at the place of homicide only a few minutes after the transaction ; yet, the testimony shows that the defendant had blown his horn for him, after the killing ; had come out from the edge of the swamp, where the slave was shot, some thirty or fifty steps ; that some two or three other persons had come to the spot from a neighboring house or field ; all before the arrival of the witness, and the statements made to him by the defendant. If, in these few minutes, there was time for all these things to take place, can it be said that there was not time *for premeditation and artifice, on the part of the defendant, with a a view to the consequences ?*

The witness states that a half hour was about the time which had elapsed from his last seeing the defendant ahead of him with the dogs, and his coming up to him at the place of the homicide.   If the defendant and the dogs passed rapidly over the distance between the point where he speaks of seeing the defendant with the dogs, and the place where the slave was killed, which distance, the witness says, was about one mile and a half, a very small portion of this half hour would have been consumed before the defendant came up with the slave ; and the interval between the homicide and the arrival of the witness would have been considerable.   He tells us, that not being able to cross a branch with his mule, he had to ride round a longer distance than was probably traversed by

the defendant and the dogs; and he also speaks of having to stop and mend his saddle girth. This is also suggestive of the conclusion, that he did not arrive immediately after the defendant. If, however, the track was winding, and the dogs moved slowly over the space alluded to, the interval of time which elapsed, was, of course, much less. It is impossible to determine this with precision. But it is not necessary, as I insist; for, in my opinion, there are circumstances enough, certainly, to prove that the defendant had abundant time for premeditation and artifice after the homicide, and before the arrival of the witness; and that his statement to that witness was a narrative of a past occurrence.

As I have said, after the killing, and before the arrival of Stafford, the defendant had time to come out from the swamp, some thirty or fifty steps, and to blow his horn for the witness. It seems that there was time for the witness, Stumps, after the transaction, to come to the place from his field, which must have been at some little distance; for he says, that when he got " within seventy-five yards of the place," the defendant called to him and asked him to go for a doctor. There was time, too, for one or two other persons to arrive at the place before the witness. If there was time for all these things, there surely was time for the defendant to resort to premeditation and artifice, in view of the consequences.

If, under such circumstances, these declarations be admitted, I do not see what is to prevent any man, who, unseen by others, stains his hands in his brother's blood, from premeditating his story, and making his own account of the transaction evidence on the trial.

I think the judgment should have been reversed.