## 38213. ANDREWS v. THE STATE.

WELTNER, Justice.

Joe Louis Andrews shot and killed his wife with a handgun. He was convicted of murder, and sentenced to life imprisonment. He appeals, urging fourteen enumerations of error, none of which is significant with the exception of that attacking the trial judge's admitting over objection the testimony of two emergency room nurses who attended the victim before her death.

The essential facts of the case are these: Andrews was in his automobile, and had in his right hand a pistol. He instructed one of his children to tell his wife to come from the house to the driveway, where he was parked. The wife came close to the driver's side of the car. The gun discharged, striking her in the chest and thumb. Andrews drove her to the hospital, where she received treatment and shortly thereafter died.

Andrews testified that he had the gun in his hand in order to remove it from the car, as one of the couple's children might be expected to use the car on that evening; that as he opened the door to

get out of the car, the gun accidentally discharged, even though his finger was not on the trigger; that the discharge of the gun was an accident, and he had no intention of inflicting any harm upon his wife. A blood-alcohol test recorded .27 grams percent alcohol content of Andrews' blood. Powder burns on the victim's skin indicated that the gun was fired from a muzzle distance of less than two inches.

We set out here the testimony of the emergency room attendants. A Ms. Harvey testified that she was with the victim in the emergency room attempting to give her intravenous fluid under the direction of the attending physicians. During that time, "she was speaking at random different statements, she was saying: 'Don't shoot me, Joe. Are you crazy? Put the gun away.' When we were trying to start her IV, she was so agitated that she looked at me and called me Joe one time. And she was pulling her arm back and we were sticking the needle in. She was just making so many different statements it is hard to remember them all. . . . She talked for about 35 or 40 minutes. She was saying, just repeating over and over, 'Don't shoot. Put the gun away. Are you crazy, Joe. Here, Joe, don't do that.' "

A Ms. Smith, also an emergency room attendant, testified, "When she first came in, we were trying to stop the bleeding, we were trying to get IV's started. We were trying to hold her down so that we wouldn't have to restrain her. . . . She was saying, 'Please, Joe, don't shoot. Here, Joe. Joe, are you crazy?' Saying some stuff like that. She kept saying it over and over. . . . She kept on fighting with her hands. . . ."

On cross-examination, the witness testified that she and her companions continued to ask the victim questions about her condition, but received no answer. "Question: 'Did she ever give any indication that you saw that she understood anything that was being said to her?' Answer: 'No.' "

Code Ann. § 38-307 provides: "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide."

The declarations of the victim do not come within the ambit of this Code section for several reasons: there is no showing that she was conscious of her impending death; there is no declaration on her part as to the cause of her injury, and no identification of the person inflicting a mortal wound. To the contrary, the testimony of the two attendants reflects words and conduct which can only be categorized as delirium.

The State urges that the admission of the testimony is warranted under the provisions of Code Ann. § 38-305, as follows:

"Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of res gestae."

And so today we face, once more, that near-insoluble enigma of our law, which we call *res gestae,* just as our predecessors on this Court have done throughout our history.

In *Mitchum v. State,* 11 Ga. 615, 622-3 (1852), Justice Nisbet wrote: "What then is meant by *res gestae*? I cannot more satisfactorily answer this question than by transcribing what I said on a former occasion. 'The idea of the *res gestae* presupposes a main fact. With this preliminary remark, I answer that the *res gestae* mean the circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character. I do not claim that this definition is perfect, for I know that the *res gestae* are different in different cases. No definition could be found so comprehensive as to embrace all cases; hence it is left to the sound discretion of the Courts what they shall admit to the Jury along with the main fact, as parts of the *res gestae.* But perhaps this definition embraces as nearly all that is meant in legal parlance by that phrase as any other that can be drawn from the books. One peculiarity of the main fact or transaction ought to be noted, and that is that it is not necessarily limited as to time — it may be a length of time in the action. The time of course depends upon the character of the transaction; it is however, well settled, that the acts of the party, or the facts or circumstances, or declarations which are sought to be admitted in evidence are not admissible, unless they grow out of the principal transaction, illustrate its character and are contemporary with it.' . . . In determining questions about the *res gestae,* it is an error to undertake to test them by a definition or rule. For what is the *res gestae* of a given transaction must depend upon its own peculiarities of character and circumstances. Courts must be allowed some latitude in this matter."

Chief Justice Lumpkin wrote the opinion in *Hart v. Powell,* 18 Ga. 635 (1855), which approved the receipt in evidence of statements of a party, relative to the reason that he had shot and killed another man, in a time when parties were incompetent to testify. Lumpkin did not use at any point in his opinion the words *res gestae,* although he quoted with approval a passage by Greenleaf (1 Greenleaf Evidence § 108) employing the term. Instead, he put this question: "We ask, do not his declarations elucidate the facts with which they are connected? Were not the Jury authorized to believe that they were made without premeditation or artifice, and without a view to the consequences? We think so, unquestionably." *Hart,* supra, at 640.

In *Cox v. State,* 64 Ga. 375, 410 (1879), Justice Bleckley wrote:

"(2) Acts are pertinent as a part of the *res gestae* if they are done pending the hostile enterprise, and if they bear upon it, are performed whilst it is in continuous progress to its catastrophe, and are of a nature to promote or obstruct, advance or retard it, or to evince essential motive or purpose in reference to it; and declarations are pertinent if they are uttered contemporaneously with pertinent acts, and serve to account for, qualify, or explain them, and are apparently natural and spontaneous."

The observations of commentators serve to enlighten, if not the rule itself, at least its enigmatic quality.

Wigmore comments: "The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology." VI Wigmore, Evidence § 1767 (1976).

McCormick agrees: "But it seems clear that the law has now reached a state at which this desirable policy of widening admissibility will be best served by other means. The ancient phrase can well be jettisoned, with due acknowledgment that it has served well its era in the evolution of evidence law." McCormick on Evidence § 288 (2d ed. 1972).

The term *res gestae* is abandoned by Harper, *Dying Declarations and Declarations Against Interest* (Ch. XVIII of Green, Ga. Law of Evidence, Ch. XIX, § 288 (1957)), with the comment: "Here we are concerned with exceptions to the hearsay rule. Testimony as to a statement is offered in evidence to prove the fact asserted in the statement. The admissibility of testimony concerning such a statement depends on whether it comes within a recognized exception to the hearsay rule because admittedly it is an out-of-court statement not subjected to cross-examination. And absent cross-examination, it must be shown that such a statement was made under circumstances which the courts deem sufficiently trustworthy to give the statement some probative value."

A lonely exception in this scholarly diatribe is Agnor. "It seems desirable to use the doctrine of res gestae to broaden the admission of evidence. It seems unusual that the textwriters would attempt to create such a restrictive theory. The 'convenient vagueness' of the doctrine of res gestae is one of its assets. It permits the admission of desirable evidence in the discretion of the judge that should be received . . . The res gestae exception is a very usable exception to the

hearsay rule." Agnor's Ga. Evidence § 11-32 (1976).

*Res gestae* is a Gordian Knot, which no one has succeeded in untying. Lacking an Alexander, it remains as yet unsevered.

This brief survey should be sufficient to demonstrate the futility of attempting now still another definition, for like Joel Chandler Harris' tar baby, striking another blow means getting stuck another time! We will, however, analyze the questioned evidence in the light of traditional discussions concerning *res gestae.*

It must be noted that the declarations of the victim are not those of a person in control of her faculties. To the contrary, they and the victim's accompanying physical actions display severe disorientation, as well as confusion as to where she was, what was happening, and who was around her.

Was it then error to admit it?

We think not.

"We ask, do not [her words] elucidate the facts with which they were connected? Were not the Jury authorized to believe that they were made without premeditation or artifice, and without a view to the consequences? We think so, unquestionably." Lumpkin, C. J., in *Hart v. Powell,* supra, at 640.

Those articulations cast a piercing light upon Andrews' contention of accidental discharge, and though confused and disjointed are undeniably "free from all suspicion of device or afterthought" (Code Ann. § 38-305). We believe that the jury could find in them the truth.

Finally, we turn to another beclouded area — the standard for the review of evidentiary rulings within the realm of *res gestae.*

Our earlier cases held that the determination of admissibility as part of the *res gestae* is "left to the sound discretion of the Courts." *Mitchum v. State,* supra, at 622. *Hart v. Powell,* supra, at 639. Later cases have departed from this standard in favor of the more rigid inquiry of error *vel non. Peebles v. State,* 236 Ga. 93 (222 SE2d 376) (1976); *Henderson v. State,* 210 Ga. 680, 683 (82 SE2d 638) (1954); *Augusta & S. R. Co. v. Randall,* 79 Ga. 304 (3) (4 SE 674) (1887). But see *Thomas v. State,* 242 Ga. 712 (251 SE2d 294) (1978).

We believe that the correct rule is one grounded in Chief Justice Lumpkin's compelling question, supra — the answer to which of necessity will invoke the discernment of the trial judge.

The rules of evidence must never be regarded as the Law of the Medes and the Persians which changeth not. Rather, they are nothing more than standards which thoughtful observers have found to be effective in delineating that information which is both enlightening and reliable to such degree as to warrant being considered in the making of important decisions. Those delineations

have changed over the years, by statute and interpretation, and will doubtless continue to change in the future. "We would remark, in conclusion, that evidence must accommodate itself, and it is constantly doing so, to the state of society and the concerns of the world around us." Lumpkin, C. J., in *Hart v. Powell,* supra, at 642.

Therefore, a trial judge's determination that evidence offered as part of the *res gestae* is sufficiently informative and reliable as to warrant being considered by the jury will not be disturbed on appeal unless that determination is clearly erroneous.

As to other enumerations of error; the evidence was sufficient to enable a rational trier of fact to find the guilt of the accused beyond a reasonable doubt; the trial court did not err in admitting statements of the accused after a Jackson-Denno hearing; and there was no error in admitting scientific evidence concerning blood-alcohol content, nor in the charge of the court. Andrews' attack upon the composition of the grand and trial jury lists, coming as it did after conviction, is not timely. *Young v. State,* 232 Ga..285 (206 SE2d 439) (1974). All other enumerations of error are without merit.

*Judgment affirmed. All the Justices concur, except Gregory, J., who concurs in the judgment only.*

DECIDED APRIL 6, 1982.

*Donald W. Huskins,* for appellant.
*Joe Briley, District Attorney, Michael J. Bowers, Attorney General, W. Davis Hewitt, Assistant Attorney General,* for appellee.