### A11A0787. MOREY v. THE STATE.
### A11A1342. EVANS v. THE STATE.
(719 SE2d 504)

ADAMS, Judge.

Claude Morey III and Deandre M. Evans appeal their convictions and sentences arising out of a fight that took place on July 3, 2007 outside the main gate of Six Flags amusement park. Both young men were convicted on counts of aggravated battery, aggravated assault, battery, simple assault, and participating in a criminal street gang. Among other things, they challenge the sufficiency of the evidence, the trial court's ruling on a motion in limine, and the court's finding that they received effective assistance of counsel. The two cases have been consolidated for purposes of appeal.

The evidence presented at trial by the victims shows the following: On July 3, 2007, 18-year-old Devin Carter, a recent

high school graduate, and his friends Joshua and Gerald Martin (who are cousins), went to Six Flags to have a good time and to celebrate Devin being accepted into an art school. They rode a Cobb County Transit (CCT) bus to the park, arriving about 1:00 p.m., and they stayed until almost 8:00 p.m. They left via the main entrance/front gate and planned to ride CCT home. They walked out of the park, to a hotel to use the bathroom, and back toward the CCT bus stop; they eventually sat down on a guardrail to wait for the next bus.

Sitting there, Devin saw a group of 15 to 20 young, black males, dressed in similar clothing — white and black t-shirts and tank tops, some with "flags" on them, exit the front gate and walk past his group. Carter had seen the group earlier in the park. Videotape of the large group leaving the park, including Evans, was shown to the jury; it shows 15 to 20 individuals, many in white t-shirts, walking, running, and jumping as they exit the gate. Devin testified that the large group appeared to be together because they were talking with each other, and they appeared angry because they were loud, rowdy, hyperactive, and cursing. Devin and his cousins did not interact with the large group at that time.

Eventually, Devin and his cousins walked the rest of the way to the CCT bus stop, and when they arrived, the same large group came across the street from the MARTA bus stop and attacked them without provocation. Five or six young men attacked Devin, who was punched in the head, thrown to the ground, and kicked and punched repeatedly. More of the large group focused on Joshua. After one or two minutes of fighting, the large group ran off and jumped on a MARTA bus. Devin got up and saw that Joshua was lying on the ground unconscious and bleeding, with bruises on his face. Two days after the incident, Joshua was still semi-comatose and unable to speak to the detective. He spent a week or two in the hospital and since the incident, he repeats things, is "very slow," and is paranoid. Gerald was also hit, but he managed to avoid significant injury. The victims were not able to identify the specific people who attacked them.

The State presented evidence from three individuals who confessed and pleaded guilty to being involved in the beating. Willie Franklin testified that he knew he was going to fight the victims fifteen minutes in advance and that he struck one of the victims with brass knuckles that he had received from another member of the group. Franklin testified that he knew both Evans and Morey at the time and that he was with them that day, but he claimed not to know their role in the fight. In a statement to a detective, however, Franklin stated that Morey and Evans were part of the group outside the park, that the group simply chose innocent victims to attack, and

that Morey kicked and stomped the victim in the head. He added that he wanted to tell the truth and he wanted to call Morey and tell him to turn himself in. Brandon Forbes admitted that he and others attacked the three boys without provocation. Forbes testified that after Franklin hit Joshua with brass knuckles, the group, which included Evans and Morey, then knocked Joshua to the ground and kicked and stomped on him repeatedly. Jonathan McCoy testified that he hit one of the victims a couple of times. He was with Evans that day but did not remember seeing Evans as part of the fight; he testified that Morey was a part of the group just before the fight began.

Detective Christopher Sperrazza of the Cobb County Police Department investigated the assault. A week after the incident and after Sperrazza read Evans his *Miranda* rights, Evans waived his rights and gave a statement in which he told the detective that he witnessed the beating but that he had not participated and that he left on the bus. He admitted wearing a white t-shirt and black pants that day.

1. Both appellants challenge the trial court's denial of their motion in limine regarding an incident involving two white families inside the park earlier on the same day and regarding references to a gang. In that incident, a large group of teenage, black males, dressed mostly in white t-shirts, ran full speed by the two families and almost ran into one of their small children. That led to a confrontation between the two fathers and the group, during which members of the group were yelling and making vulgar hand gestures and other unusual hand motions, which the State characterized as flashing gang signs. After the group left, one of the fathers — John Tapp — spoke to security, and the families returned to enjoying the park. But at the end of the day, Tapp saw the same group near the main gate, and he heard someone in the group say, "We'll get you in the parking lot." When the families exited the park, the young men were standing outside the gate; somebody said, "That's them"; and the group followed the families into the parking lot. The families were able to leave without further incident. Tapp could not identify the appellants as being part of the group, but he was pretty sure it was the same group. The attack on the victims occurred shortly after the two families left.

In their motion, Evans and Morey argued the incident was inadmissible because it happened sometime before the alleged crimes, there was no evidence showing they were involved in the incident with the families, the evidence injected the issue of racial prejudice into the proceedings, and the evidence was so prejudicial that no curative instructions could remove the prejudice from the minds of the jury. Morey also moved that the State not be allowed to

mention gang activity. The State proffered that witnesses would testify that Evans and Morey were present for the incident with the families, as well as during the attack on the victims. The State argued that the earlier incident was a part of the res gestae of the crime and that the gang evidence was proper because the case involved charges of participating in illegal gang activities.

The trial court denied the motions, but the court stated that if the State failed to "tie these events together, both in a proximity of time" and also by showing a relationship between the incident with the families and the incident with the victims, including the allegation of gang activity, "the prejudicial effect may be such that it might require further instructions to the jury about what to disregard or to even more serious curative measures."

"The determination of admissibility under the res gestae exception rests within the sound discretion of the trial court, and this Court will not disturb that determination absent abuse. [Cit.]" *Kuykendoll v. State*, 278 Ga. App. 369, 371 (3) (629 SE2d 32) (2006). *Andrews v. State*, 249 Ga. 223, 228 (290 SE2d 71) (1982) (clearly erroneous).

> In cases involving the review of the grant or denial of motions to suppress or motions in limine, we must construe the evidence most favorably to uphold the findings and judgment of the trial court, and that court's findings as to disputed facts and credibility must be adopted unless clearly erroneous.

(Citation and punctuation omitted.) *Self v. State*, 245 Ga. App. 270, 272-273 (2) (537 SE2d 723) (2000).

During the trial, several of the witnesses testified about the earlier incident, including references to a gang. Following Tapp's trial testimony, which essentially tracked the State's proffer, Forbes testified that as of July 3, 2007, he was a Six Flags employee; that he had been acquainted with Evans, also an employee, for about two months; and he "knew of" Morey, who worked with Forbes's brother in a different division at the park. On the day of the incident, neither Forbes nor Evans was working; rather, they were just hanging out together at the park with 15 or 20 others. Forbes characterized the group as Evans's friends. Evans was wearing a bandana that day that had the letters "YGL" on it, and Forbes asked him what the letters meant. Evans said that "YGL" was a gang and that he was the leader. Others in the group also wore black or white bandanas or t-shirts with "YGL" on them. Forbes thought about 10 to 15 of the young men were in the gang, but he did not believe that Morey was a member. He testified that the letters "YGL" had been spray-

painted on the lockers and floor in the employee locker room at the park, and pictures were introduced in support.

Forbes testified that he was present for the verbal altercation with John Tapp and the two families. He testified that a friend of Evans bumped into a child to start the altercation, that Evans took part in the altercation, that Evans was "repping his gang," and the group was "throwing up their flags"; Forbes did not characterize this activity as flashing gang signs. Forbes did not place Morey as being present during the Tapp incident. After the incident, a group that included Forbes and Evans ran off and rode rides elsewhere in the park. But they later joined with several others including Morey. The two groups discussed the earlier altercation with the families. Forbes testified that Evans said the group was going to the parking lot to fight the families; Morey was a part of that conversation. The group eventually went to the parking lot; Forbes specifically identified himself and Evans in a video of young men leaving the park. Forbes saw the two families go to their cars. Then he and a couple of others went to the bus stop; the rest of the group, including Evans and Morey, arrived about five minutes later. The large group then attacked the three victims without provocation.

Franklin testified that Evans told him he was a member of YGL, but Franklin testified that Morey was not a member. In Franklin's statement to Sperrazza, he said that Evans was the leader of YGL and the leader of "what happened."

McCoy testified that he, along with Evans, was part of the altercation with the two families; that he saw the two men from the families outside the park; and that when the group was unable to fight the men, they turned their attention to the three victims and fought them without provocation. McCoy testified that Evans had a rap group named "YGL."

Evans testified in his own defense that he was at the park that day wearing black pants and a white shirt with the letters "YGL" on it, which, he explained, stood for "Young Ghetto Legends," the name of a rap music group to which he belonged. He denied being in a group named by the detective as "Young Gangsters Living." He testified that he did not know Morey at the time although he recognized him from working in the park. He admitted being present at the incident involving the two families, and he referred to the person who almost ran into the child as "one of my little cousins." But he testified that he was not a part of the ensuing altercation or the beating of the victims, although he admitted to being within five or six feet of the fight.

Morey testified that he had been working in the park that summer for about 30 days before the incident and that he was 17 years old at the time. He testified that he was at the park with his

friend Ryan Parker that day and that he had prearranged a ride home with Willie Franklin. At the end of the day, they called Willie, and after Willie picked them up, he told them that he had been involved in a fight and had struck a person with brass knuckles. Based on the timing, Morey believes he was inside the park at the time of the fight. He testified that he did not know Evans, McCoy, or Forbes. He testified that he did not see the fight with the victims or the altercation with the families and that he did not know anything else about those incidents that day.

Following the State's presentation of evidence, Morey moved for a directed verdict on all counts, including the count of being involved in criminal street gang activity. Evans moved for a directed verdict on several counts, including the gang count, as well. In response, the State argued that the gang activity was comprised of the crimes charged in the present case. No prior criminal activity was mentioned.

(a) The incident with the two families was a part of the res gestae of the crime. Res gestae is defined in the Code:

> Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae.

OCGA § 24-3-3. Acts, too, are part of the res gestae if they are sufficiently related to the hostile enterprise:

> It is well settled in this state that acts are pertinent as a part of the res gestae if they are done pending the hostile enterprise, and if they bear upon it, are performed whilst it is in continuous progress to its catastrophe, and are of a nature to promote or obstruct, advance or retard it, or to evince essential motive or purpose in reference to it. (Citations and punctuation omitted.) *Sypho v. State*, 175 Ga. App. 833, 835 (3) (334 SE2d 878) (1985).

*In the Interest of J. W. B.*, 296 Ga. App. 131, 133 (673 SE2d 630) (2009). In *Sypho*, the defendant was tried for armed robbery and rape in Rockdale County. The Rockdale trial court allowed evidence of crimes the defendant committed earlier on the same day against the same victim in Jasper County. *Sypho*, 175 Ga. App. at 835 (3). This Court affirmed and held that the earlier crimes were part of the res gestae of the Rockdale crimes because there was a relationship between the two sets of crimes sufficient to satisfy the definition of res gestae quoted in *J. W. B.* above. Id. See also *Johnson v. State*, 264

Ga. 456, 458 (2) (448 SE2d 177) (1994) ("Acts and circumstances forming a part or continuation of the main transaction are admissible as res gestae") (citation and punctuation omitted).

This case is similar. Evidence was presented that linked the earlier incident involving the two families to the beating of the victims in several ways: Many of the same individuals were involved; both involved a large group of similarly dressed young men who were moving about the park together; both Evans and Morey were a part of the conversation about doing something to the two families in the parking lot; and the motive for the beating was the thwarted desire for some sort of revenge for the earlier incident. The trial court did not err by denying the motion in limine on these grounds.

(b) The references to a gang were admissible for two reasons.

The gang-related evidence was admissible because Evans and Morey were charged with engaging in criminal street gang activity. A charge of violating the Georgia Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq., requires proof that the gang in question is a "criminal street gang," that is, a group of three or more persons that engages in "criminal gang activity"; the later term is defined as "the commission, attempted commission, conspiracy to commit, or solicitation, coercion, or intimidation of another person to commit any of the [certain enumerated] offenses." OCGA § 16-15-3 (1), (2).[1] The criminal gang activity or plans for its continuation must be ongoing at the time of the commission of the indicted offenses; in other words, "the commission of an enumerated offense by the defendant is not itself sufficient to prove the existence of a 'criminal street gang.' " *Rodriguez v. State*, 284 Ga. 803, 808 (2) (671 SE2d 497) (2009). See, e.g., *In the Interest of A. D.*, 311 Ga. App. 384 (715 SE2d 787) (2011). Thus, the evidence regarding gangs was relevant and necessary to prove these charges.

In addition, even if they place a defendant's character in issue, statements referring to a gang and a defendant's association with a gang can be admissible as res gestae of the crime. *Eason v. State*, 283 Ga. App. 574, 576 (2) (a) (642 SE2d 207) (2007). Although there was no direct evidence linking Morey to YGL,[2] Evans told others that day that YGL was a gang and that he was the leader. Moreover, Evans and others were wearing the letters "YGL" on their clothing and moving about the park together; they exited the park together; the group, including Morey, discussed taking some action against the two

---

[1] OCGA § 16-15-3 (2) was amended in 2010, effective July 1, 2010. Ga. L. 2010, p. 230, § 2. See also OCGA § 1-3-4 (a) (1) (re: effective date). But no provisions bearing on this case were changed.

[2] We find no indication that Morey moved to sever in the trial court. And there is no enumeration of error regarding severance.

families; and they were acting rowdy and angry and in search of a victim. The testimony about the gang and Evans's leadership was therefore linked to the large group and the beating of the victims, thereby providing relevance for its admission. See *Johnson v. State*, 277 Ga. App. 499, 507 (4) (627 SE2d 116) (2006) (testimony about defendants' membership in gang was relevant to show, among other things, how defendants knew one another and to provide context and motive for defendants' joint participation in crime). Therefore the trial court did not abuse its discretion by allowing this testimony.

2. Both appellants contend the evidence was insufficient to support certain of the convictions. On appeal from a criminal conviction, the evidence must be construed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence. An appellate court determines only the legal sufficiency of the evidence adduced below and does not weigh the evidence or assess the credibility of the witnesses. *Brown v. State,* 265 Ga. App. 613 (594 SE2d 770) (2004). To sustain a conviction, the evidence must be sufficient to enable a rational trier of fact to find the appellant guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

(a) Morey contends there was insufficient evidence to establish venue in Cobb County. But Evans testified that the fight was "on Cobb County's side of the bus. . . ." And Devin and Gerald indicated on an exhibit the location where they exited the park and testified that they were at the CCT bus stop. Although the appellants contend the fight occurred near the boundary with Fulton County, "if a crime is committed on, or immediately adjacent to, the boundary line between two counties, the crime shall be considered as having been committed in either county." OCGA § 17-2-2 (b). We find no error. See *Adsitt v. State*, 248 Ga. 237, 240 (4) (282 SE2d 305) (1981).

(b) Both Morey and Evans contend there was insufficient evidence to corroborate Brandon Forbes's testimony that they were involved in the crimes. See OCGA § 24-4-8 ("felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient"); *Woods v. State*, 208 Ga. App. 810 (432 SE2d 249) (1993) ("defendant may not be convicted on the uncorroborated testimony of an accomplice.").

> The rule is well established that, to sustain a conviction in a felony case upon the testimony of an accomplice, there must be corroborating facts or circumstances, which, in themselves and independently of the testimony of the accomplice, directly connect the defendant with the crime, or lead to the inference that [he] is guilty, and more than sufficient to merely cast on the defendant a grave suspicion

of guilt. . . . Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. [Cit.] See also OCGA § 24-4-8. The sufficiency of the corroborating evidence is for the trier of fact to decide. [Cit.]

*Baines v. State*, 276 Ga. 117, 119 (1) (575 SE2d 495) (2003).

With regard to Morey's participation in the assault on the victims, in addition to Forbes's testimony that Morey kicked and hit Joshua, there was evidence that Morey was involved in the conversation about retribution on the two families, that he was near the exit among the larger group shortly before the assault, and that he rode home in a car with Willie Franklin — an admitted participant in the beating. Moreover, Franklin told the detective that Morey was involved in the beating.

With regard to Evans's participation in the assault on the victims, in addition to Forbes's testimony that Evans kicked and hit Joshua, there was evidence that Evans was involved in the earlier incident with the two families and in the conversation about retribution on them, that he was near the exit among the larger group shortly before the assault, that he was the leader of the group of young men wearing YGL on their clothing, and that he was the leader of "what happened." Finally, Ander Cowart testified that he was a witness to the fight and that Evans hit Joshua. Thus, there was sufficient corroboration of both Morey's and Evans's role in the beating.

Evans and Morey were also convicted of violating the Georgia Street Gang Terrorism and Prevention Act for participating in criminal gang activity through the commission of the above offenses. See OCGA § 16-15-4. With regard to the gang charge, Forbes testified that Evans admitted being the leader of the gang "YGL"; that there were ten or fifteen gang members wearing YGL on their clothing; that this group had the encounter with the two families; that Evans was "repping his gang" at that incident; that, later, the group involved in the incident with the families, together with Morey, discussed the incident and decided to find the families and fight with them; and that the group, including Evans and Morey, then attacked the three boys without provocation. Thus, Forbes's evidence shows that a gang existed that was involved in ongoing criminal gang activities, i.e., terroristic threats and stalking,[3] and that the gang's attack on the three boys was related to those gang activities. This satisfies the requirement that the "criminal gang activity" was

---

[3] See OCGA §§ 16-15-3 (1) (A), (B); 16-14-3 (9) (A) (xxxi); 16-5-90; 16-11-37.

ongoing at the time of the incidents underlying the charged offenses. See *Rodriguez*, 284 Ga. at 809.

Franklin and McCoy corroborated Evans's and Morey's participation in the gang activities. First, Franklin provided evidence that Evans was the leader of YGL and of what happened that day. Franklin and McCoy also provided evidence that showed that Morey was part of the group of gang members outside the park right before the beating, as well as that he participated in that beating. It is "unlawful for any person employed by *or associated with* a criminal street gang to conduct or participate in criminal gang activity." (Emphasis supplied.) OCGA § 16-15-4 (a). See generally *In the Interest of K. R. S.*, 284 Ga. 853, 853-855 (2) (672 SE2d 622) (2009). And corroboration may consist of direct or circumstantial evidence "which connects the defendant with the crime, tends to show his participation therein, and would justify an inference of the guilt of the accused independently of the testimony of the accomplice." *Woods*, 208 Ga. App. at 810. Thus there is corroboration that Morey was associating with the YGL gang members in the discussion about the incident with the families, which led to the terroristic threats and stalking, and that he then participated with the gang as they attacked the victims.

(c) Morey contends there was insufficient evidence to support Count 2 of the indictment — aggravated assault, which charged Morey and three others with kicking Joshua "with a shoe-clad foot," because no one testified that Morey was wearing shoes that day. But Evans was wearing shoes, both he and Morey were involved in the kicking, and Morey can be convicted of being a party to the crime based on his participation. OCGA § 16-2-20 (a). See *Clark v. State*, 311 Ga. App. 58 (714 SE2d 736) (2011) (which of two defendants actually held the weapon was not material as long as one did and the two acted in concert).

(d) Morey contends there was insufficient evidence to support the conviction of aggravated battery because the evidence did not support the allegation of the indictment that Joshua's brain had been rendered "useless, in violation of OCGA § 16-5-24." See OCGA § 16-5-24 (a), which provides:

A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof.

We affirm where there is evidence the victim suffered a substantial loss of use of a member of his or her body. See *Webb v. State*, 228 Ga.

App. 624, 625 (3) (492 SE2d 312) (1997); *Taylor v. State*, 178 Ga. App. 817, 820 (344 SE2d 748) (1986) (Beasley, J., concurring specially).

Here, evidence was presented to show that after the attack, Joshua was unable to finish high school and he could no longer look after his younger cousin Gerard as he had previously; he had trouble communicating and "[s]low reactions"; and Devin "[had] to repeat things to him for him to comprehend sometimes, like, it doesn't seem to register everything in his mind like he used to." At the time of trial, more than 14 months after the beating, Joshua had been in continuous treatment for his condition and was living in a treatment center. Gerard testified that whereas Joshua used to take care of him, he now had to take care of Joshua. During Joshua's own testimony, the jury was able to witness his inability to remember recent events or events about the incident. The jury was authorized to discount Joshua's testimony that his condition was the same as before the incident. This evidence was sufficient for the jury to conclude that Joshua had a substantial loss of brain function.

3. Morey contends the trial court erred by denying his motion for mistrial based on statements by the prosecutor made during closing argument. The prosecutor attempted to explain the fact that on two counts the trial court would be charging the jury on lesser included offenses. Morey claims that during this explanation, the prosecutor implied that because the defendants asked for those charges they had admitted guilt.

The prosecutor said:

> It's been asked to give you a charge on simple battery and simple assault with respect to the two aggravated assault charges. . . . They are offering it as a compromise because they sometimes feel like, I guess, well, the jury goes back there, and if they can't get themselves over that hump, then maybe they will take this lesser one.

Morey objected, and, after the prosecutor concluded his argument and the court recessed for lunch, he requested a mistrial. The court gave a curative instruction as a part of its overall charge to the jury in connection with explaining the charges on the lesser offenses; Morey objected to this curative instruction and renewed his objection/motion. The court's curative instruction went as follows:

> When lesser included offenses are legally appropriate, the Court makes a determination as to whether such offenses should be charged to the jury. The jury should draw no inference with respect to any request for such offenses to be included by the Court in its charge. The jury will disregard

any reference to such request made in the closing argument.

Based on the prosecutor's statement, this instruction was sufficient to remove a possible implication that the defendants were admitting guilt to the lesser included offenses. The prosecutor only said that "they" — presumably, the defense — offered the charges "as a compromise," in other words, a compromise between the State's assertion of guilt to the greater charges and the defense's assertion of innocence. The statement was therefore unlikely to produce the inference suggested by Morey, and if it did, the jury was instructed to disregard any such inference and that it is the trial court that decides whether to give such a charge.

> A trial court's decision not to grant a mistrial based on a prosecutor's improper remarks will not be disturbed on appeal absent a manifest abuse of discretion. [Cit.] Moreover, a new trial will not be granted unless it is clear that the trial court's curative actions failed to eliminate the improper argument from consideration by the jury. [Cit.]

*Byrum v. State*, 282 Ga. 608, 613 (10) (652 SE2d 557) (2007). We conclude that denying the motion for mistrial was not an abuse of discretion.

4. Morey contends the trial court erred by failing to merge the convictions on Counts 2 and 3. In the two separate counts, Morey was charged with aggravated assault on Joshua Martin "with a shoe-clad foot" and "with metal knuckles," both being "instruments which, when used offensively against a person, [are] likely to and actually did result in serious bodily injury, in violation of OCGA § 16-5-21." Morey argues that aggravated assault using two weapons on the same victim at the same time constitutes but one crime. But multiple wounds on the same victim resulting from different weapons will support convictions for more than one offense. *Lett v. State*, 160 Ga. App. 476, 477 (4) (287 SE2d 384) (1981). See also *Rouse v. State*, 295 Ga. App. 61, 63-65 (1) (670 SE2d 869) (2008); *Thomas v. State*, 310 Ga. App. 404 (5) (714 SE2d 37) (2011).

5. Both Morey and Evans contend they suffered from ineffective assistance of counsel at trial. Under *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), the appellant "must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. [Cit.]" *White v. State,* 283 Ga. 566, 569 (4) (662 SE2d 131) (2008). On claims of ineffective assistance of counsel, Georgia appellate courts will uphold a trial court's findings of fact unless they are clearly erroneous but

review legal conclusions de novo. *Hunter v. State*, 281 Ga. 526, 528 (2) (a) (640 SE2d 271) (2007); *Cherry v. State*, 283 Ga. App. 700 (1) (642 SE2d 369) (2007).

(a) Morey contends he received ineffective assistance of counsel in three ways: his trial counsel failed to object when Detective Sperrazza commented on the credibility of a defense witness; trial counsel was so unprepared that he gave an opening statement that contradicted Morey's own testimony; and trial counsel ignorantly failed to request a charge on a lesser-included offense for aggravated battery.

On the first point, at the hearing on his motion for new trial, Morey's counsel failed to raise the issue of Sperrazza's comments or to ask trial counsel why he failed to object to Sperrazza's comments. "Where the issue of trial counsel's effectiveness has been raised on motion for new trial, any claims of ineffective assistance by trial counsel not raised at that time are waived[,] [Cit.]" and, therefore, they are "procedurally barred. [Cit.]" (Punctuation omitted.) *Howard v. State*, 281 Ga. App. 797, 804 (6) (637 SE2d 448) (2006). See also *Wilson v. State*, 286 Ga. 141, 144-145 (4) (686 SE2d 104) (2009), citing *Howard* with approval.

On the second point, during trial counsel's opening statement, he told the jury the evidence would show that Morey ran when the attack began; yet Morey testified that he never saw the fight and did not know about it. In the State's closing argument, the prosecutor argued to the jury that Morey's trial counsel said in his opening statement that he was going to prove with the State's evidence that Morey ran and hid in a car when the attack began. The prosecutor argued that he hoped the jurors were taking notes when trial counsel "promised that that was going to be the defense in this story." The prosecutor then took advantage of the discrepancy with strong rhetoric:

> Because I guess, as the trial progressed, [Morey] decided upon a better story. And instead of going with the story that he ran and hid in the car, he now takes the stand and says, "I wasn't there at all. When the whole thing was going down, I was somewhere in the park, I guess, riding the rides still. And then when I got ready to go home, I called Willie, who's not my friend, on the phone, and he came back and picked me up."

At the hearing on the motion for new trial, trial counsel explained that he was only appointed a week before trial and he did not recall that Morey's testimony was inconsistent with his opening statement. Even if it was, Morey presented another witness at the

hearing on the motion for new trial who testified that he and Morey were in a car at the time of the assault and that they could see the assault. This evidence is a basis for concluding that Morey may have testified in an unexpected manner at trial. See *Sloan v. State*, 172 Ga. App. 620, 621 (6) (323 SE2d 834) (1984) (trial counsel's actions "arose from unanticipated testimony at trial rather than lack of adequate time for preparation"). And at the new trial hearing, Morey did not ask trial counsel why he did not take any action in response to Morey's testimony being inconsistent with his opening argument. "There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance." (Citations and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004). In short, Morey has not shown that counsel made an uninformed tactical decision or otherwise engaged in deficient performance regarding his client's testimony.

On the third point, Morey contends trial counsel was ineffective because at the charge conference he stated that he did not believe there were any lesser-included offenses for aggravated battery (Count 1). Presumably, Morey therefore faults trial counsel for failing to request any such charge. Again, however, first appellate counsel did not raise this issue at the hearing on the motion for new trial nor ask trial counsel about that issue. Where the defendant fails to question trial counsel concerning a strategic decision, he fails to carry his burden to demonstrate deficient performance. *Dyer v. State*, 278 Ga. 656, 660 (7) (604 SE2d 756) (2004). And the decision could have been tactical because, as trial counsel did point out, if the State failed to prove that the assault rendered Joshua's brain useless, the jury would not be authorized to convict.

(b) Evans contends he received ineffective assistance because trial counsel failed to adequately investigate and present Evans's alibi defense, including failing to subpoena alibi witnesses and failing to call one alibi witness who was present for the trial. At the new trial hearing, Evans presented several purported alibi witnesses who did not testify at trial. And Evans cross-examined trial counsel about his attempts to identify, locate and secure these witnesses for trial. He contends trial counsel's conduct was deficient and that, absent that deficiency, there is a reasonable probability that the trial result would have been different.

First, we agree with the trial court that the new witnesses were not, strictly speaking, alibi witnesses. The witnesses did not testify that Evans was somewhere else at the time of the fight; rather, like Evans himself, they admitted that Evans was very near the fight but claimed he was not involved. An alibi must exclude the possibility of

presence at the scene of the crime:

> The defense of alibi involves the impossibility of the accused's presence at the scene of the offense at the time of its commission. The range of the evidence in respect to time and place must be such as reasonably to exclude the possibility of presence.

OCGA § 16-3-40. Cf. *Dixon v. State*, 157 Ga. App. 550, 550 (278 SE2d 130) (1981) (where evidence "is vague and uncertain, and . . . does not negate the possibility of [defendant's] presence at the scene," the trial court does not err by failing to charge on alibi without a proper request).

Our review of the testimony at the hearing on the motion for new trial shows that trial counsel reviewed the State's file, including hearing transcripts and plea statements; he telephoned State witnesses; he met with Evans and his mother on several occasions; and he met with counsel for the co-defendants. Counsel identified witnesses through the news media, through newspaper reports, through witness statements, and through other transcripts and discovery. Moreover, trial counsel spoke with Evans and his mother about potential witnesses, and Evans's mother gave him a list of seven or eight names. Counsel turned the list over to his paralegal/ investigator, with whom he had worked for more than 25 years. According to counsel, the investigator, who was not called as a witness at the hearing, attempted to investigate all of the leads. But he reported back that, in each case, either the purported witness could not be found, would not be interviewed, or had no relevant information. Counsel made calls as well, but to no avail. Counsel testified that he was very frustrated with the lack of witnesses. Over the course of the representation, counsel stressed at each of seven or eight meetings with Evans and his mother that he needed witnesses:

> From day one, I told Mr. Evans I needed a list of any witnesses there, people that I could bring into my office, people that I could interview, people that would be his witnesses.

He testified that no witness ever came forward in over a year of representation. Accordingly, he did not file a witness list for trial. He even gave Evans's mother a stack of subpoenas on the day of trial and told her that he needed any witnesses she could get immediately. Again none came forward. Although some of the witnesses testified that no one ever contacted them, the trial court was authorized to believe trial counsel's testimony to the contrary.

Counsel did testify that Evans brought a young man with him to one of the meetings but that he, counsel, did not speak to him. Yet that witness only partially corroborated Evans's testimony: he testified Evans was with him at the scene, approximately 25 feet away from the fight. Moreover, the court found that the witnesses at the hearing were not credible. Counsel also admitted that other than the above efforts, he "did not go out and look for people. I didn't go door to door and canvas the neighborhood"; nor did he go to Six Flags to talk to any employees or security personnel. Nevertheless, no Six Flags employees or security personnel were offered as witnesses at the new trial hearing.

In sum, the trial court determined that trial counsel was "as prepared as he could be given the level of cooperation of his client and the incomplete nature of the information given to him prior to trial" and therefore, not ineffective. We find no error in the trial court's determination that counsel's performance was not deficient. Accordingly, we need not reach the question of whether Evans could show harm.

*Judgments affirmed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED NOVEMBER 3, 2011 —
RECONSIDERATION DENIED NOVEMBER 18, 2011 —

*Zell & Zell, Rodney S. Zell, Lawrence W. Daniel*, for appellant (case no. A11A0787).

*Louis M. Turchiarelli*, for appellant (case no. A11A1342).

*Patrick H. Head, District Attorney, Amelia G. Pray, Jason D. Marbutt, Assistant District Attorneys*, for appellee.